Hal DAVID, et al., Plaintiffs,

v.

SHOWTIME/THE MOVIE CHANNEL,
INC., Defendant.

No. 85 Civ. 9017 (CHT).

United States District Court,
S.D. New York.

Oct. 18, 1988.

Paul, Weiss, Rifkind, Wharton & Garrison (Jay Topkis, Allan Blumstein, David E. Nachman, David S. Nalven, of counsel), Bernard Korman (Ross Charap, I. Fred Koenigsberg, of counsel), New York City, for plaintiffs.

Weil, Gotshal & Manges (R. Bruce Rich, Kenneth L. Steinthal, Suzanne E. Hawkins, of counsel), New York City, for defendant.

## OPINION

TENNEY, District Judge.

Plaintiffs, individual members of the American Society of Composers, Authors and Publishers ("ASCAP") bring this copyright infringment action under the Copyright Act, 17 U.S.C. § 101 *et seq.* (1983), against defendant Showtime/The Movie Channel, Inc. ("SMC"). Defendant neither contests the validity of plaintiffs' copyrights nor denies that Showtime and The Movie Channel both broadcast the works at issue in this dispute. Rather, SMC interposes various affirmative defenses.

The court has before it two motions brought by plaintiffs. The first seeks class certification pursuant to Fed.R.Civ.P. ("Rule") 23 or alternatively under Rule 23.-2. The second, brought under Rule 56(c), seeks to strike or dismiss six affirmative defenses. For the reasons stated below, plaintiffs' motion for class certification is granted; plaintiffs' motion to dismiss the defenses is granted in part and denied in part.

## BACKGROUND

SMC provides television programming to thousands of cable television system operators through Showtime and The Movie Channel, its two cable television services. Both services transmit programming to cable system operators, who in turn broadcast the programs via cable directly to individual subscribers. The bulk of SMC's programming transmissions consist of motion pictures created for theatrical release, many of which contain plaintiffs' musical compositions.

SMC was created in 1983 from the merger of Showtime and The Movie Channel. Prior to 1980, both entities had been licensed by ASCAP to transmit plaintiffs' copyrighted works. These licenses terminated on December 31, 1979.[1] Upon their termination, ASCAP advised both cable services that it preferred not to negotiate with them for new licenses. ASCAP's intent was to license the cable system operators directly with respect to broadcasts of music in programming furnished to the cable operators by services such as Showtime and The Movie Channel.

It appears that ASCAP encouraged the two cable services not to make written applications for a determination of fees. ASCAP apparently believed that these would have interfered with negotiations with the cable operators. In fact, neither Showtime nor The Movie Channel elected to follow the procedures set forth in the consent decree.

The negotiations between ASCAP and the cable operators lasted two years but were in vain. Sometime in 1982 or 1983, after failing in its attempt to license the cable operators directly, ASCAP returned to both Showtime and The Movie Channel in an effort to resume the prior licensing relationships. The parties entered into negotiations that lasted two years but they did not conclude in any written agreements. During these negotiations, SMC still chose not to invoke its right to a license by the procedures specified in the consent decree.

During these efforts at renewing their agreements, ASCAP apparently treated both Showtime and The Movie Channel as if they were licensed. Accordingly, neither company was deemed to be a copyright infringer and hence no legal action was taken. Both parties agreed that in the event the negotiations were unsuccessful, the issue of a reasonable fee would be submitted to the Rate Court in accordance with the procedure set forth in the consent decree.

According to ASCAP, its agreement to treat both Showtime and The Movie Channel as licensed during the negotiation period was conditioned on both companies' agreement to apply any prospective fee rate retroactively back to January 1, 1980, the date after the previous licenses had expired. ASCAP claims that this agreement was to apply regardless of whether the parties agreed on a fee or whether a fee was imposed by the Rate Court. Showtime and The Movie Channel claim that they had agreed to pay a fee back to January 1, 1980 only if the direct negotiations were successful. SMC further claims that it never relinquished its right to assert a statute of limitations defense in any Rate Court proceeding.

---

1. Upon the expiration of these licenses, Showtime and The Movie Channel could have continued being licensed by making written applications to ASCAP. *See United States v. ASCAP*, No. 13-95 (S.D.N.Y. March 14, 1950). In addition, if they could not come to an agreement with ASCAP, they could have applied to this Court (the "Rate Court") for determination of a reasonable fee, pursuant to a consent decree previously entered into by ASCAP and the Department of Justice. *Id.*

On April 4, 1984, SMC made written application to ASCAP to become officially licensed once again. Subsequent to this written application, SMC, on September 12, 1984, instituted a fee determination proceeding in the Rate Court, pursuant to the consent decree. The application sought a prospective fee determination and a retroactive fee rate back only to April 4, 1981, rather than back to the date the cable services ceased to be licensed, January 1, 1980. In essence, SMC took the position that it would not pay fees for the performance of ASCAP music from January 1, 1980, to April 3, 1981.

In response to SMC's application, ASCAP wrote a letter dated April 9, 1984, in which it stated that ASCAP would be willing to continue treating the cable services as fully licensed from January 1, 1980, provided that the two services confirmed their "continued willingness" to pay any subsequently determined fees back to that date. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 8 (quoting AS-CAP's letter dated April 4, 1984). SMC claims that this was the first time that ASCAP took the position that in a Rate Court proceeding, the time period for submission was to be retroactive to January 1, 1980, irrespective of any possible statute of limitations defense. *Id.* In an April 13, 1984, response, SMC wrote that it had never agreed to waive its statute of limitations defenses in any subsequent rate proceeding.

The rate proceeding was assigned to Judge William C. Conner, who referred the matter to Magistrate Michael H. Dolinger. ASCAP was granted interim relief effective April 4, 1984, but it also moved to dismiss the retroactive portion of SMC's application. Magistrate Dolinger granted that motion. *See* Memorandum and Order of Magistrate Dolinger, dated July 8, 1986, attached as Exhibit B to the Affidavit of

Allan Blumstein, sworn to July 22, 1987 ("Blumstein Aff."). Magistrate Dolinger ruled that under the terms of the consent decree, the Rate Court had no jurisdiction to determine a retroactive fee. *Id.* at 7.[2]

Plaintiffs commenced this action on November 15, 1985. Due to the Copyright Act's three-year statute of limitations, plaintiffs' complaint seeks damages for copyright infringement only from November 15, 1982, until April 4, 1984, the date SMC became officially licensed by virtue of its written application to ASCAP.

Plaintiffs now move for class certification and for partial summary judgment seeking dismissal of the six affirmative defenses claimed by SMC. These defenses are that: (1) plaintiffs have failed to state a claim upon which relief can be granted; (2) Showtime and The Movie Channel did not "publicly perform" the copyrighted works within the meaning of the Copyright Act; (3) Showtime and The Movie Channel were licensed because of alleged agreements with ASCAP; (4) SMC was licensed due to its application to the Rate Court; (5) and (6) plaintiffs are estopped from charging infringement because of ASCAP's alleged conduct.

## DISCUSSION

### A. *Class Certification*

 Plaintiffs move pursuant to Rule 23 or alternatively under Rule 23.2 for an order certifying this litigation as a class action. In certifying and managing a class action the court is afforded substantial discretion. *Fink v. National Sav. and Trust Co.*, 772 F.2d 951, 960 (D.C.Cir.1985). At the outset, the court rejects the proposition that Rule 23.2 may be invoked by plaintiffs. Rule 23.2 was designed to facilitate class actions brought by unincorporated associations on their own behalf. The accompanying notes of the advisory committee suggest that Rule 23.2 was adopted to give

---

2. Under the reasoning of Magistrate Dolinger's decision, the consent decree as currently worded would not appear to allow retroactive relief. This court, however, which retains jurisdiction over the decree, has the power to modify it to achieve substantial justice. *See Matarese v. Le-*

*Fevre,* 801 F.2d 98, 106 (2d Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987); 11 C.A. Wright & A.R. Miller, Federal Practice and Procedure §§ 2863–64 (1973 & Supp.1988).

"entity treatment" to representatives of the membership of an unincorporated association when for formal reasons it cannot sue or be sued as a jural person under Rule 17(b). *See* Rule 23.2 advisory committee's notes. Here, plaintiffs are bringing suit on behalf of themselves as individual members of ASCAP. Plaintiffs concede that only individual members of ASCAP are entitled to bring this action. Plaintiffs' Memorandum in Support of its Motion for Summary Judgment ("Pl.Mem.") at 2 n. 1. Therefore, because ASCAP is not suing for itself, Rule 23.2 is inapplicable.

Rule 23, however, is appropriate for this motion but in resolving a motion for class certification a court must undertake a rigorous analysis of Rule 23. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). The burden of establishing that all of the requirements of Rule 23 have been met falls directly on the party seeking class certification. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 162, 94 S.Ct. 2140, 2145, 40 L.Ed. 2d 732 (1974). The requirements of Rule 23 are as follows: the plaintiffs must demonstrate (1) that the action satisfies all four of the threshold requirements enumerated in Rule 23(a); and (2) that the action falls within one of the three categories of Rule 23(b).

### 1. Rule 23(a)

Rule 23(a) provides:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

#### (a) *Numerosity*

■ To establish numerosity, plaintiffs must show that the proposed class is so massive that joinder would be impracticable. No magic number or set standard exists regarding this requirement. *See* 7A C.A. Wright, A.R. Miller & M.K. Kane, Federal Practice and Procedure § 1762 at 153 (1986); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 137 (D.N.J.1984). Rather, a court should utilize a common sense approach. *Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 171 (E.D.Pa.1979). Defendant cannot seriously dispute plaintiffs' estimate that their size "number[s] in the many hundreds, if not thousands." Plaintiffs' Memorandum in Support of its Motion for Class Certification at 5. The existence of such a large number of individuals renders joinder a judicial impracticality. Defendant's argument that class certification should be denied because the proposed class may be overbroad is unpersuasive because at an early stage of litigation a court may view the class broadly and reduce it in the future, if necessary. *See General Tel.*, 457 U.S. at 160, 102 S.Ct. at 2372; *Avagliano v. Sumitomo Shoji America, Inc.*, 103 F.R.D. 562, 573 (S.D.N.Y.1984). Moreover, the individual plaintiffs are scattered over the United States constituting geographical dispersion. This further supports plaintiffs' claim that they have fulfilled the numerosity requirement. *See Avagliano*, 103 F.R.D. at 580. Accordingly, the court finds that plaintiffs have satisfied this aspect of class certification.

#### (b) *Common Questions of Law and Fact*

The court's examination of plaintiffs' compliance with Rule 23(a)(2) is limited by the Supreme Court's admonition not to consider the merits of the sustantive claims. *Eisen*, 417 U.S. at 177–78, 94 S.Ct. at 2152–53. The key inquiry of Rule 23(a)(2) is whether the plaintiffs' claims arise from a common nucleus of facts. Such cases are considered particularly appropriate for class action treatment. *See In re Caesars Palace Sec. Litig.*, 360 F.Supp. 366, 398 (S.D.N.Y.1973).

■ Numerous questions of both fact and law are common to the class including whether defendant violated the federal copyright laws and the measure of any

damages. Defendant contends that there are differences among the plaintiffs. Certainly each individual plaintiff possesses an individual copyright upon which the claim will be based. These differences, however, are merely collateral to the gravamen of this dispute: the negotiation and licensing processes between SMC and ASCAP on behalf of all potential members of the class. Incidental differences do not defeat commonality. *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (E.D.N.Y.1982). Accordingly, the court finds that plaintiffs have satisfied this part of the test.

#### (c) *Typicality*

■ The typicality requirement of Rule 23(a)(3) is met if the named plaintiffs share the same basic characteristics with those of the proposed class so as to avoid interclass conflicts. Typicality is present if all of the claims are based upon the same course of conduct and are based upon a similar legal theory. *Bruce v. Christian*, 113 F.R.D. 554, 558 (S.D.N.Y.1986). Each potential or named plaintiff claims to hold a valid copyright which, it is alleged, defendant broadcast without providing appropriate compensation. Therefore, there exists a congruence of interests between all of the plaintiffs both named and proposed, and the court finds the typicality requirement satisfied.

#### (d) *Adequacy of Representation*

■ Under Rule 23(a)(4) the plaintiffs must demonstrate that they, in conjunction with their counsel, will fully and completely safeguard the interests of the class. This requirement entails the court's examination of: (1) the quality of plaintiffs' counsel; and (2) whether the named plaintiffs share the same interests with the proposed class. *Fisher v. Plessey Co. Ltd.*, 103 F.R.D. 150, 157 (S.D.N.Y.1984). With respect to the adequacy of plaintiffs' counsel, there is little doubt they possess the requisite legal talent to litigate their case. Furthermore, the record is devoid of any evidence of a conflict of interest between the named plaintiffs and the proposed class. Therefore, the court concludes this part of the test has been satisfied.

#### 2. Rule 23(b)

■ In addition to the requirements of Rule 23(a), a class action must satisfy one of the three parts of Rule 23(b). Plaintiffs have relied on Rule 23(b)(1) and, therefore, must demonstrate that individual litigation by members of the class would either: (1) create a risk of inconsistent adjudication, subjecting an opponent of the class to inconsistent judicial directives; or (2) burden the interests of the members of the class who are not actual parties to the litigation. *Denenberg v. Blum*, 93 F.R.D. 131, 133 (S.D.N.Y.1982). If the claims in this action were litigated in piecemeal fashion, there would be a risk of inconsistency in the formulation of individual remedies, the differences between which might appear arbitrary. *See Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 53 F.R.D. 531, 537 (D.N. H.1971). The court concludes, therefore, that plaintiffs have fulfilled this part of the test.

### B. *Affirmative Defenses Interposed by SMC*

#### 1. The Alleged Failure to State a Claim

■ The standard for dismissal under Rule 12(b)(6) is well settled. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *see Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 80 (2d Cir.1985). Moreover, for the purposes of deciding such a motion, well pleaded allegations are accepted as true and are examined in the light most favorable to the plaintiff. *Scheur v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). SMC has not pressed its first affirmative defense in any of its briefs, or at oral argument; accordingly, the court will not dwell on this issue. Suffice it to say that under

the preceding analysis, plaintiffs' allegations set out a valid legal claim and SMC's first affirmative defense is dismissed.

### 2. The Assertion That SMC Did Not "Publicly Perform" the Works

■ Under the Copyright Act, plaintiffs would be entitled to compensation from SMC only if SMC "publicly performed" the relevant works. 17 U.S.C. § 106(4) (1983). Neither side disputes that Showtime and The Movie Channel both broadcast television programming containing plaintiffs' copyrighted works to cable system operators. SMC's second affirmative defense asserts only that SMC's actions did not constitute a "public performance" of plaintiffs' music as contemplated by the statute. SMC argues that since its signals went not to the viewing public but to local cable television operators for retransmission, it cannot be liable for copyright infringement. Def.Mem. at 26. Therefore, the issue before the court is whether the transmission of copyrighted material to an intermediary for ultimate transmission to the public falls within the scope of the Copyright Act.

The court's analysis must begin, of course, with the Copyright Act itself. Although it does not address this issue directly, the language of the Act supports plaintiffs' contentions that the activities of Showtime and The Movie Channel constituted public performances. Under the Act, to "perform" a work means:

> to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

17 U.S.C. § 101 (1983). It is readily apparent that both Showtime and The Movie Channel at least "performed" works in the manner described by the statute. The statute also states, however, that to perform a work "publicly" means:

> to transmit or otherwise communicate a performance or display of the work ... to the public, *by means of any device or process*, whether the members of the

public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101 (emphasis added).

The decision of how broadly to construe the emphasized language should be guided by a determination of Congressional intent through an examination of the Copyright Act's legislative history. *See Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). The House Report accompanying the statute suggests that the concept of "public performances" should be interpreted broadly. For example, it states:

> Under the definitions of "perform," "display," "publicly," and "transmit" in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, *but also any further act by which that rendition or showing is transmitted or communicated to the public.* Thus, for example: a singer is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers; and any individual is performing whenever he or she plays a phonorecord embodying the performance or communicates the performance by turning on a receiving set.

H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 63, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5676–77 (emphasis added).

The preference for an expansive reading of the Copyright Act is also evident in the Report's discussion of the meaning of the term "transmit," in which it states:

> The definition of "transmit"—to communicate a performance or display "by any device or process whereby images or sound[s] are received beyond the place from which they are sent"—is broad

enough to include *all conceivable forms and combinations* of wired or wireless communications media, including *but by no means limited to radio and television broadcasting as we know them.* Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in [any] form, that case comes within the scope of [the Copyright Act].

H.R.Rep. No. 1476 at 64 (quoting 17 U.S.C. § 101), *reprinted in* 1976 U.S.Code Cong. & Admin.News at 5678 (emphasis added).

At the time the accompanying reports were drafted, Congress apparently did not anticipate the eventual proliferation of organizations such as SMC who "broadcast" their programs to the public indirectly, through local cable companies who pass the signal along to their individual customers. Nevertheless, in recognition of rapid technological developments in the copyright area, courts have interpreted the Copyright Act flexibly to reduce the need for frequent Congressional amendments. *See, e.g., Midway Mfg. Co. v. Artic Int'l, Inc.,* 704 F.2d 1009, 1011 (7th Cir.) (finding video games to be "audio-visual" works within the meaning of the statute), *cert. denied,* 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983); *Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 856 (2d Cir.1982) (stating that the output product of video games is "fixed" and, therefore, subject to copyright protection, even though each player's participation creates a unique set of sounds and sights).

■ With this in mind, it seems apparent from the scope of the examples provided in the legislative history that Congress intended the definitions of "public" and "performance" to encompass each step in the process by which a protected work wends its way to its audience. Moreover, it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public.

Aside from the artificially narrow interpretation it would require, SMC's argument ignores SMC's fundamental role in determining how and when the works in this case were used. To the copyright holders —the beneficiaries of the statutory scheme—SMC is a programming originator who intended to broadcast the protected works to the public for a profit. SMC was not and is not, as it would have to be to claim exemption from the Copyright Act, "passive, merely retransmitting exactly what it receives, [exercising] no control over the content or selection of [another broadcaster's] primary transmission...." *Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 129 (2d Cir. 1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983), *see* 17 U.S.C. § 111(a)(3) (1983). SMC alone decided which movies to show and when to show them.

It made little difference to the copyright holders whether SMC intended to route the protected work to the public's living rooms through a local cable company or through a transmitter atop a mountain. In either case, SMC would be transmitting the copyright holders' works to the public and benefitting by those acts. Therefore, the court holds that SMC's transmission of the works in this case constituted "public performances" within the meaning of the Copyright Act.[3] *See WGN Continental Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622, 625 (7th Cir.1982) (holding that "the

---

**3.** SMC correctly notes that the Second Circuit declined to reach this issue in *Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 127 n. 5, *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983). SMC also asserts, however, that the *Eastern Microwave* court questioned the Seventh Circuit's reasoning in *WGN Continental Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622, 625 (7th Cir.1982), in which the court held that retransmissions by cable companies to other cable companies were "public performances." *See* Def.Mem. at 29. SMC's assertion is undermined by the Second Circuit's subsequent decision in *National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 809 F.2d 172 (2d Cir.1986), in which the court cited the *WGN* decision in noting that "[c]able retransmissions are recognized as public performances under § 106(4)." *Id.* at 179 n. 9.

Copyright Act defines 'perform or display ... publicly' broadly enough to encompass indirect transmission to the ultimate public"); *Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.,* 593 F.Supp. 808, 813 (D.Minn.1984) (stating that "under the broad definitions found in § 101 of the Copyright Act, a transmission is a public performance whether made directly or indirectly to the public and whether the transmitter originates, concludes or simply carries the signal"), *aff'd,* 777 F.2d 393 (8th Cir.1985), *cert. denied,* 479 U.S. 1005, 107 S.Ct. 643, 93 L.Ed.2d 699 (1986).

The court is mindful that the standards for granting summary judgment are stringent. Rule 56(c) provides that summary judgment may be granted only when the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In ascertaining whether an issue of material fact does actually exist, the court is obligated to resolve all doubts and all inferences in favor of the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Even under this standard, however, SMC's second affirmative defense fails; accordingly, it is dismissed.

### 3. SMC's Contention That There Was a Contract With ASCAP

SMC's third affirmative defense asserts that the parties are bound by a series of oral communications amounting to two oral contracts, one with Showtime the other with The Movie Channel. According to SMC, ASCAP agreed to treat both companies as licensed. Therefore, Showtime and The Movie Channel were authorized to perform the works and SMC cannot be held liable for copyright infringement.

### (a) The Legal Standards Governing Contract Formation

New York law recognizes that oral contracts can result in enforceable obligations. *See Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–04, 369 N.Y.S.2d 400, 408, 330 N.E.2d 414, 420 (1975). However, it is the law of New York, as adopted by the Second Circuit, that

> [t]o consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation. If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result.

*Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978) (citations omitted). To be enforceable, an agreement must be definite and explicit enough so that a court may determine the intent of the parties "to a reasonable degree of certainty." *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 587 (2d Cir.1987).

### (b) The Alleged Agreements

There are two alleged agreements, which the court will discuss in turn. The first was between ASCAP and Showtime. Plaintiffs claim that Showtime agreed to pay fees back to the start of January 1, 1980, but only if the fees were negotiated privately between the parties, not through a Rate Court determination. Showtime further claims that according to the understanding, if the parties were forced to submit their claims to the Rate Court, Showtime could assert a statute of limitations defense.

The negotiations between ASCAP and Showtime have been exhaustively reflected in the extensive deposition testimony taken pursuant to the Rate Court proceeding.[4] Showtime's negotiating representative, Michael H. Gerber, testified as follows:

**4.** Both parties have agreed that any discovery taken in that action may be utilized in this litigation. *See* Blumstein Aff., Ex. C (Letter from David E. Nachman, Esq., to Kenneth L. Steinthal, Esq., dated March 5, 1987).

Q. You had mentioned that the prior agreement with ASCAP had expired, I believe at the end of 1979.

And my question is whether as of 1982 you had an understanding as to whether Showtime was licensed to perform works in the ASCAP repertory for any of the years 1980, 1981 and 1982?

A. I didn't have an understanding with ASCAP that we were licensed or not licensed. We had an understanding that we were negotiating in good faith, and that while we were negotiating in good faith, there was nothing to worry about.

\* \* \* \* \* \*

Q. What was the time period at issue in those negotiations?

\* \* \* \* \* \*

A. It was always the general understanding that the scope of the negotiations covered a going-back arrangement as well as a going-forward arrangement.

Q. When you say going back, do you mean going back to the time period immediately subsequent to the expiration of the prior agreement?

A. Yes. It would have been from 1980, '81, '82, and then going forward for some perhaps 3 to 5 years.

\* \* \* \* \* \*

Q. Did you have any understanding as to what time period, and that is fees for what time period, would be submitted for litigation, in the event that you could not reach a negotiated settlement?

\* \* \* \* \* \*

A. I always have an understanding in my own mind.

My position always was that when two businessmen get together and try and strike a deal, since it is an arm's length free market that is ultimately determining what the price is between the two of us, I was always willing to go back to the beginning of the retroactive period and tie it in from a retroactive deal to a going-forward deal, as one ball of wax. And I always felt that as a

matter of negotiation, if we were able to resolve it on an amicable basis, that is the time frame within which I was willing to do that.

On the other hand, I was also very much committed to the fact that if a third party was going to tell us what rate we were required to pay, then that issue would encompass the period going back through the statute of limitations and not beyond that, since I always felt that I should not have to pay more to my supplier than he would be entitled to if he sued me in a court.

Blumstein Aff., Ex. D at 32, 41, 62–63. The above deposition testimony, in light of the standards governing summary judgment, adequately supports SMC's claim that there was a mutual understanding regarding some type of agreement.

 Plaintiffs claim there was no enforceable contract because an essential aspect of the agreement, namely the "duration" of it, was inconclusive. The court is cognizant that "definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do...." *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y. 2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981). It is true that duration is often considered a material term. *See Ginsberg Machine Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir.1965). Nevertheless, the question of the "essentiality" of a particular term is relative. *Id.* Moreover, duration is generally considered a material term when referring to a contract's *future* performance. *See* 22 N.Y.Jur.2d *Contracts*, § 25 at 439–40 (1982). The thrust of the agreement was to set prospective fees and there was no dispute as to at least one aspect of the agreement's retroactive application. Therefore, the court finds that the failure to resolve the disputed term pertaining to how far back the retroactivity would extend was not essential to the formation of a valid contract and, hence, was not material.[5]

---

**5.** Moreover, even if the disputed term were material, there is a disputed issue of fact as to what

The second alleged agreement was between ASCAP and The Movie Channel. Immediately following the expiration of The Movie Channel's license on December 31, 1979, negotiations commenced between ASCAP and The Movie Channel to renew the license. The testimony reveals that there was an agreement between both parties. *See* Blumstein Aff., Ex. F (testimony of Benson H. Begun, representative of The Movie Channel).

 Plaintiffs concede there was a contract but claim that the oral agreement has been or should be rescinded by operation of law. According to plaintiffs, SMC reneged on the agreement by requesting the Rate Court to set a retroactive fee only for the period covered by the statute of limitations period rather than back to January 1, 1980. It appears that SMC could technically be found to have "breached" the agreement entered into between ASCAP and The Movie Channel. However, rescission is a remedy usually employed by an injured party only when monetary damages are not adequate, *see* 22 N.Y.Jur.2d Contracts § 416 at 336–37, something plaintiffs have not established in this case.

There is no application before the court to rescind the alleged agreement; therefore, the court is not passing on the factual questions underlying this issue. Nevertheless, for the purposes of denying the motion to strike SMC's third affirmative defense, the court finds the claim of rescission to be without merit.

4. SMC's Contentions That its Performances of Plaintiffs' Works Were Authorized

SMC pleads several affirmative defenses in which it asserts that its performances of plaintiffs' works during the period of alleged infringement were authorized. Plaintiffs claim that SMC should be estopped from claiming any type of authorization by virtue of its previous conduct in the licensing process. For the reasons articulated below, the court rejects plaintiffs' estoppel arguments but dismisses SMC's

the parties actually agreed upon. Therefore, the court could not strike the defense but would

fourth affirmative defense for failure to state a legally cognizable claim.

### (a) *Issue Preclusion*

 Generally, a party to a legal proceeding may not relitigate issues previously determined in other litigation to which he or she was a party. *See Index Fund, Inc. v. Hagopian,* 677 F.Supp. 710, 716 (S.D.N.Y.1987). For this rule of issue preclusion to apply:

(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986) *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987). The court is not convinced that the authorization issue was ever before Magistrate Dolinger. But even if it were, plaintiffs do not, and could not on this record, contend that the issue was "actually litigated." Moreover, considering that Magistrate Dolinger merely decided that he had no jurisdiction to determine retroactive rates, resolution of the authorization issue was hardly "necessary" to the outcome of those proceedings. Therefore, there can be no issue preclusion based upon this theory.

### (b) *Judicial Estoppel*

Plaintiffs also rely on a related but disfavored theory of "judicial estoppel" to support their argument. *See* Pl.Mem. at 14–15. This doctrine, also commonly referred to as "preclusion against inconsistent positions," prevents a party who benefits from the assertion of a certain position from subsequently adopting a contrary position in any other litigation. *See Horger v. New York University Medical Center,* 642 F.Supp. 976, 980 (S.D.N.Y.1986). The doctrine conflicts with liberal federal approaches to proceedings prior to judgment, which favor, for example, alternative plead-

have to await resolution of the factual issue at trial.

ing and liberality in granting permission to change positions. *See* 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.405[8] at 243 (2d ed. 1988) [hereinafter "Moore's"]. Accordingly, it has not been widely embraced in the Second Circuit.[6] Instead, it has been discussed only in extreme cases in which the inconsistent positions have been the product of fraud or other deliberately misleading conduct and those in which the consequences of the inconsistency would have undermined the integrity of the judicial process. *Compare Sperling v. United States*, 692 F.2d 223, 227–29 (2d Cir.1982) (Van Graafeiland, J., concurring) (advocating application of the doctrine to case in which habeas petitioner had obtained previous appellate relief with misleading assurances to the court about the continued vitality of a related conviction and life sentence, which he subsequently attacked in the new petition before the court), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), *with Horger v. New York University Medical Center*, 642 F.Supp. 976, 980–81 (S.D.N.Y. 1986) (refusing to apply the doctrine to medical malpractice case in which plaintiff challenged the necessity of a surgical procedure when he had successfully convinced a prior jury in litigation against his employer that the surgery had been a necessary and proper treatment for his injuries, because the court found that plaintiff "may have" relied on misinformation provided by his employer's doctors in asserting the earlier position); *see also* 1B Moore's ¶ 0.405[8] at 243 (explaining that federal courts "have been somewhat cautious in their approach to the doctrine").

 Assuming, without deciding, that the doctrine has any vitality in this circuit, plaintiffs fail in their attempt to apply it to the facts in this case. Initially, plaintiffs must rely on the dubious proposition that SMC's mere filing of a license application for only a three-year period was tantamount to an affirmative statement to the Rate Court that its use of the works during this period of time was unauthorized. In advancing this argument, plaintiffs also ignore the fact that any assertion of fact, if one occurred at all, occurred when SMC filed its license application with ASCAP, not when it subsequently asked the Rate Court merely to establish a fair fee for the period already specified in the license application. *See* Pl.Mem. at 4. Therefore, SMC's selection of the three-year period, even if it could be characterized as an affirmative assertion, did not occur in the Rate Court, where it would have had to have taken place to warrant application of the doctrine.

Plaintiffs fail to consider the fact that ASCAP's own conduct precipitated SMC's actions. SMC's failure to take any steps to apply for a renewal license in 1980 supports its allegation that it refrained from doing so at ASCAP's urging. It appears that ASCAP never obtained any type of tolling agreement from SMC, even when the duration of the ultimately failed negotiations with local operators approached and then exceeded three years. *See* 17 U.S.C. § 507(b) (1983). SMC now claims that it never waived its right to assert a statute of limitations defense in any Rate Court proceeding. *See* Def. Mem. at 22. Regardless of whether the evidence will bear out that claim, limiting the period of its application to the preceding three years merely preserved that defense.

Absent ASCAP's request not to file in 1980, SMC would not have had to try to obtain an unprecedented retroactive license. When the renewed negotiations with ASCAP stalled, SMC found itself in the untenable position of performing AS-CAP's works pursuant to an unwritten agreement, the terms of which were beginning to be disputed by ASCAP. Accordingly, SMC initiated the formal licensing procedure to eliminate that uncertainty. It was under no duty to file for a retroactive license, but elected to do so, apparently to protect itself from any infringement claims during the period in which it was theoretically vulnerable. There is no evidence

---

**6.** In fact, it is not entirely clear that the doctrine is recognized in this circuit at all. *See United States v. Bedford Assocs.*, 713 F.2d 895, 904 (2d Cir.1983); *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 920–21 & n. 3 (S.D.N.Y. 1983), *aff'd*, 746 F.2d 112 (2d Cir.1984).

that SMC intended to mislead ASCAP or the court when it sought retroactive relief. In this context, SMC can scarcely be accused of playing "fast and loose with the courts," as plaintiffs claim. *See* Pl.Mem. at 15 (quoting *Selected Risks Insurance Co. v. Kobelinski,* 421 F.Supp. 431, 434 (E.D.Pa.1976) and *Scarano v. Central Railroad Co.,* 203 F.2d 510, 513 (3d Cir. 1953)). Moreover, Magistrate Dolinger's limited ruling, that he had no jurisdiction to set a retroactive fee, conferred no benefit on SMC. Therefore, there is no basis to apply the doctrine in this case.[7]

### (c) *SMC's Failure to State a Claim in its Fourth Affirmative Defense*

■ Although the court finds no legal barrier to SMC's assertion of its authorization defenses, they must have some basis in logic. SMC's fourth affirmative defense, in which it claims that it was "effectively licensed" by virtue of its retroactive application to ASCAP, fails even this basic test. Under Magistrate Dolinger's ruling, the retroactive application is presently no more than a legal nullity. Moreover, recognition of the subsequent filing of an application for a "retroactive" license as a defense for prior infringing conduct would eviscerate the protections inherent in the copyright scheme. Accordingly, the court dismisses this affirmative defense.

### 5. SMC's Estoppel Defenses

SMC's fifth and sixth affirmative defenses, which the court will consider together, assert that plaintiffs should be estopped from claiming infringement by virtue of ASCAP's conduct. The discussion below applies only to Showtime because there was an actual contract between ASCAP and The Movie Channel. Under the law of New York, the elements of a claim for promissory estoppel are: "(1) a clear and unambiguous promise; (2) a reasonable and

foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel." *Marine Transport Lines, Inc. v. International Organization of Masters, Mates & Pilots,* 636 F.Supp. 384, 391 (S.D. N.Y.1986); *see* Restatement of Contracts (Second) § 90 (1981) *cited in Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

The court is aware that promissory estoppel is not to be lightly applied. The doctrine has "a relatively limited scope." *Philo Smith & Co. v. United States Life Corp.,* 554 F.2d 34, 36 (2d Cir.1977); *see Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc.,* 804 F.2d 787, 794 (2d Cir.1986). For the purposes of deciding this motion for summary judgment, the court has construed all inferences and facts in SMC's favor. Even under this analysis, however, the record would support a defense of estoppel. Although there was no written promise of any type between ASCAP and Showtime, there appears to have been an understanding that as long as both parties negotiated, ASCAP or its members would not sue. Whether the understanding contemplated Showtime paying back to January 1, 1980, or only for three years is the disputed issue.

■ The circumstances of the instant case indicate that the elements of estoppel have been demonstrated sufficiently by SMC so as to prevent the court from striking it prior to trial. Moreover, since ASCAP explicitly gave permission to Showtime to continue broadcasting during the pendency of the negotiations with the local cable system, it appears quite possible that the estoppel defense will be successful at trial. *See, e.g., National Business Lists, Inc. v. Dun & Bradstreet, Inc.,* 552

---

**7.** In addition, SMC's claim that it was not licensed by ASCAP was apparently a legal conclusion of its counsel, *see* Pl.Mem. at 14, who could reasonably have not anticipated the magistrate's decision and this resultant lawsuit. Therefore, it would be inappropriate to apply the doctrine in this context. *See Konstantinidis v. Chen,* 626 F.2d 933, 940 (D.C.Cir.1980) (holding that the doctrine should not apply to a case in which the

"major failing is the absence of clairvoyance") (quoting *Johnson Service Co. v. Transamerica Insurance Co.,* 485 F.2d 164, 175 (5th Cir.1973)), *discussed in Horger,* 642 F.Supp. at 981; 1B Moore's ¶ 0.405[8] at 243 (stating that "in the absence of clear fraud the assertion of a legal conclusion or opinion will not result in preclusion").

F.Supp. 89, 98 (N.D.Ill.1982). Therefore, there is certainly no basis to deprive defendant of the right to introduce evidence more fully substantiating this defense at trial.

## CONCLUSION

It is indeed unfortunate that this case is before the court at all. Both sides recognize that a sum of money is owed, and ASCAP will most likely receive from SMC overdue but acceptable compensation for the broadcast of the works at issue. Nevertheless, instead of simply negotiating a fair figure, as reasonable businesses might, the parties have regrettably turned the matter over to their attorneys, who have enmeshed it in an unnecessary legal battle.

The nature of this dispute is relatively straightforward: SMC used and obtained the benefit of ASCAP members' works who understandably expect reasonable compensation. Adorning that basic concept with debatable legal issues hardly alters the underlying equities. Accordingly, the court sees little benefit to either side in clinging to the lawsuit as the mechanism for determining a reasonable figure.[8]

Nevertheless, the court is obliged to resolve the motions before it. Accordingly, for the foregoing reasons, plaintiffs' motion to certify the litigation as a class action is granted. The motion to dismiss defendant's affirmative defenses is granted as to the first, second and fourth defenses. The motion is denied as to the third, fifth and sixth defenses.

So Ordered.

---

**8.** Although this case has been prosecuted as a copyright infringement, it is essentially an action for breach of contract or unjust enrichment. Accordingly, if this court were called upon to determine a "reasonable" figure at this point, it would probably be guided by the rates in effect before this controversy arose.