**RECIPROCAL MERCHANDISING SERVICES, INC., Plaintiff,**

v.

**ALL ADVERTISING ASSOCIATES, INC., Lino Associates, Inc. and Alfred L. Lino, Sr., Defendants.**

No. 88 Civ. 8055 (SWK).

United States District Court, S.D. New York.

Jan. 31, 1994.

Levine & Dembia by Michael L. Levine, New York City, for plaintiff.

Camhy Karlinsky & Stein by Martin E. Karlinsky, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this action for unjust enrichment and breach of an alleged oral contract, defendants move for an order, pursuant to Federal Rule of Civil Procedure 56(a), granting them summary judgment and dismissing plaintiff's amended complaint on the grounds of (1) judicial estoppel; and (2) failure of proof. Plaintiff opposes the motion. For the reasons set forth below, the defendants' motion is denied.

## BACKGROUND[1]

In November 1983, plaintiff Reciprocal Merchandising Services, Inc. ("RMS") was a New York corporation, engaged in the trade and barter business.[2] Marshall Koplitz ("Koplitz"), a 51 percent stockholder of RMS, was the chairman of the board and president. Perry Silver ("Silver"), who owned 26 percent of RMS's stock, served as the company's officer and director.

Defendant All Advertising Associates, Inc. ("All Advertising") is a Florida corporation that was also involved in the trade and barter business. In 1989, All Advertising sold substantially all of its assets to defendant Lino Associates, Inc. ("Lino Associates"). Defendant Alfred L. Lino, Sr. ("Lino") served as the president of All Advertising in 1983, and continues to act as a consultant to Lino Associates.

## I. The All Trade Credits

The defendants contend that, in 1983, All Advertising acquired certain trade credits from, *inter alia*, Cunard Lines, Princess Hotels and Costa Cruises, having a total value of $241,715.60 (the "All Trade Credits").[3] According to the defendants, a non-party corporation, Convention Group Specialists, Inc. ("CGS–NY") held the All Trade Credits "in trust" for All Advertising for tax reasons, and All Advertising permitted CGS–NY to draw upon the All Trade Credits.[4] If CGS–NY were to draw upon the credits, the number of credits available would be reduced, and CGS–NY would owe a corresponding obligation to All Advertising, either to compensate it with a cash payment, or to provide it with other acceptable trade credits. CGS–NY allegedly reflected the ownership by All Advertising of the All Trade Credits as a

1. Unless otherwise indicated, the following facts are taken from the parties' Rule 3(g) statements, the affidavit of Alfred L. Lino, Sr., sworn to on October 2, 1991 (the "Lino Aff."), the affidavit of Robert C. Boneberg, sworn to on March 25, 1992 (the "Boneberg Aff."), the affidavit of Perry Silver, sworn to on January 22, 1992 (the "Silver Aff."), and the affidavit of Perry Silver, sworn to on January 31, 1992 (the "Silver Supp. Aff.").

2. Firms that engage in the barter industry trade "perishable" products and services, such as unsold cruise cabins, hotel rooms and airline seats, in return for either "soft" products and services, such as unsold radio and television time, or hard goods, such as electronics equipment.

3. Using the All Trade Credits, All Advertising could draw upon services provided by the trade credit's supplier. In the case of Cunard Lines and Costa Lines, for example, All Advertising could book cruises on either of such lines. Similarly, with respect to Princess Hotels, All Advertising could utilize the credits to book hotel rooms.

4. Plaintiff contends, however, that the defendants have not produced any trust document evidencing the fact that CGS–NY was holding the All Trade Credits "in trust" for All Advertising.

liability on its books.[5]

## II. The Cunard Credits

In August 1983, All Advertising secured a deal with Cunard Lines in which Cunard Lines would furnish All Advertising with trade credits in the sum of $398,704.69 (the "Cunard Credits") in exchange for a certain number of videotape recorders ("VCRs"). According to the defendants, RMS and All Advertising agreed to split the transaction, each contributing an equal amount of cash ($75,000) to acquire the VCRs, and each becoming entitled to one-half of the Cunard Credits.[6]

## III. The "Merger"

On November 1, 1983, CGS–NY sold all of its assets, including the All Trade Credits, to Koplitz. Koplitz apparently formed a new corporation, Convention Group Specialists, Inc. ("CGS–NJ"), to act as the buyer in this transaction. CGS–NJ and RMS operated from the same premises during this period, and shared staff and resources. Koplitz informed Lino that he had purchased the assets of CGS–NY with the eventual plan of merging the business, activities and assets of CGS–NJ with RMS. In connection with this merger, the All Trade Credits held by CGS–NY would also be transferred to RMS. Accordingly, Koplitz requested that All Advertising bill RMS for those All Trade Credits that had been used by CGS–NY. On December 22, 1983, Lino wrote to Koplitz, indicating that All Advertising could not bill RMS for those credits unless RMS and CGS–NY had in fact merged their businesses. *See* letter from Lino to Koplitz of 12/22/83, annexed to the Lino Aff. as Exh. "E."

Although Koplitz did not respond to the December 22, 1983 letter, defendants contend that, beginning in November 1983, certain officers and employees of CGS–NJ and RMS confirmed to Lino and to other parties that a merger of the businesses and affairs of CGS–NJ and RMS had been effected. Specifically, on December 15, 1983, James Meyer ("Meyer"), vice-president of RMS[7] and CGS–NJ, wrote a letter to a non-party corporation, indicating that "[t]his is to inform you that Convention Group Specialists and R.M.S. have merged...." *See* letter from James E. Meyer to Jacqui of La Petite Marmite of 12/15/83, at 1, annexed to the Lino Aff. as Exh. "D." According to plaintiff, however, CGS–NY and RMS never merged.

## IV. The Credits Transaction

### A. The Transaction

When Lino learned that Koplitz and CGS–NJ had acquired the assets of CGS–NY, including the All Trade Credits that were allegedly being held in trust for All Advertising, Lino indicated to Koplitz that he "could not and would not consent to the transfer of the obligation from CGS–NY to RMS." Lino Aff., ¶ 23. Lino demanded that Koplitz, CGS–NJ or RMS immediately convey the All Trade Credits to All Advertising. Koplitz, however, refused to execute this transfer.

According to the defendants, the parties ultimately agreed that RMS would transfer its half of the Cunard Credits to All Advertising in lieu of transferring the All Trade Credits (the "Credits Transaction"). In early 1984, the Cunard Credits were transferred to All Advertising, and All Advertising allegedly disclaimed any interest in the All Trade Credits held by CGS–NJ.

Plaintiff denies that the Credits Transaction ever took place. Instead, plaintiff contends that Koplitz transferred the Cunard Credits to All Advertising in payment of a

---

**5.** While CGS–NY's statements of account indicate that CGS–NY "owed" All Advertising a certain sum of money, the statements do not indicate whether CGS–NY was holding any credits in trust for All Advertising. *See* statements of account, annexed to the Silver Aff. as Exh. "B."

**6.** Plaintiff contends that RMS traded with Cunard Lines for the Cunard Credits, and argues that there is no evidence to support the defendants' theory that the Cunard Credits were joint-

ly held by RMS and All Advertising. Specifically, plaintiff claims that Koplitz used RMS funds to purchase 200 VCRs from the General Electric Company and traded those VCRs to Cunard Lines for $398,704.69 worth of credits.

**7.** Plaintiff contends that Meyer was not an officer, shareholder, director or agent of RMS, and that he was not authorized to make any statements on behalf of RMS.

debt owed to All Advertising from CGS–NY, and that RMS received no consideration for this transfer. Moreover, plaintiff argues that CGS–NY did not transfer assets of any kind to RMS in payment of the Cunard Credits.

### B. Documents

Both parties have submitted various documents in support of their contentions that the Credits Transaction either did or did not take place. For example, the defendants point to a written reconciliation undertaken by the accounting staffs of All Advertising and RMS, dated February 27, 1984, as evidence that All Advertising relinquished control over the All Trade Credits in exchange for the Cunard Credits. The reconciliation allegedly records the Credits Transaction and discloses that, at the end of the transaction, RMS still owed All Advertising the sum of $15,751.72. *See* letter from Andrew Kobel, controller of RMS, to Cheryl Harper, All Advertising's bookkeeper, of 2/27/84, annexed to the Lino Aff. as Exh. "F."

Plaintiff contends, however, that this reconciliation was not prepared in the ordinary course of business, was not prepared with Silver's knowledge or consent, and was not within Kobel's authority.[8] As evidence that Kobel was not acting within the scope of his authority in preparing the reconciliation, plaintiff points to a memorandum from Kobel to Harper, dated May 10, 1984, in which Kobel refers to a "secret agreement . . . negotiated in a spylike fashion." *See* memorandum from Kobel to Harper of 5/10/84, annexed to the Silver Aff. as Exh. "E." According to plaintiff, the "secret agreement" was the Credits Transaction, and was, therefore, executed without the consent of any RMS officer. Plaintiff contends further that the reconciliation did not accurately reflect information contained in RMS's books and records.

Defendants also rely upon a "trade available form" as evidence that RMS carried the All Trade Credits in its inventory, and used them in its business. *See* trade available form, annexed to the Lino Aff. as Exh. "H." The trade available form, which sets forth the trade credits in RMS's inventory, reveals that, in 1983, RMS had available credits from Costa Lines and Cunard Lines. According to the defendants, RMS never had any direct relationship with either of these accounts prior to Koplitz's acquisition of CGS–NY. As a result, defendants argue that RMS must have obtained these credits from CGS–NY, as part of the Credits Transaction. Plaintiff contends, however, that RMS had direct trade agreements with both Cunard Lines and Costa Lines, and that Silver personally traded on those agreements on several occasions.[9]

## V. RMS's Bankruptcy

In April 1984, Silver discovered that Koplitz had stolen approximately $750,000 in funds from RMS. After being confronted with these allegations, in May 1984, Koplitz resigned his positions with RMS and surrendered his stock ownership in the company. As a result, Silver became a 100 percent shareholder of RMS. RMS thereafter asserted various claims against Koplitz which were settled in 1988.

Subsequently, on June 29, 1984, RMS filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Pursuant to 11 U.S.C. § 705, a creditors committee was constituted (the "Creditors Committee"). According to the defendants, by the time RMS filed for bankruptcy, Silver knew that RMS had transferred the Cunard Credits to All Advertising. *See* Silver Dep. at 104–105. The defendants contend that, despite this knowledge, RMS made no disclosure respecting any claim that RMS

---

8. Nevertheless, Silver admits that Kobel was directly responsible for keeping trade ledgers for RMS's various accounts. *See* transcript of the deposition of Perry Silver, dated June 11, 1991 ("Silver Dep."), at 31, annexed to the Boneberg Aff. as Exh. "N."

9. Defendants contend, however, that Silver's statement that he "personally" traded on the

Cunard Lines and Costa Lines agreements is contradicted by his own deposition testimony. At his deposition, Silver indicated that "the handling of the trade, and the other credits that we owned were handled primarily by Marshall Koplitz, and I really don't know what we owned or what contracts we had in existence at that time." *See* Silver Dep. at 20.

had against All Advertising arising out of the Credits Transaction to either the Creditors Committee or the Bankruptcy Court.

Specifically, the defendants contend that RMS failed to disclose its claim against All Advertising in the statement and schedule of assets, the disclosure statement and the second amended plan of reorganization. *See* Lino Aff., ¶¶ 51–53. The defendants also contend that RMS failed to inform any member of the Creditors Committee about the existence of its claim against All Advertising. *Id.* at ¶¶ 55–56. With respect to the disclosure statement, RMS stated that "[t]he Company [RMS] is unaware of any other actions which may lie in its favor and which would benefit the Company's creditors." *See* Disclosure Statement, annexed to the Lino Aff. as Exh. "K." According to the defendants, this statement was fraudulent as Silver already had knowledge of the claim against All Advertising at the time the disclosure statement was drafted.

Plaintiff contends, however, that it indicated to the Bankruptcy Court in its disclosure statement and financial statements the fact that it was owed approximately $440,576.00 as a result of "expenditures by [RMS] for the direct benefit of [CGS–NY]." *See* Silver Aff., ¶ 8. Plaintiff contends further that the Bankruptcy Court and its creditors were informed that "these expenditures were solely for the benefit of Convention Group Specialists which is wholly owned by Marshall Koplitz." *Id.* In addition, plaintiff alleges that a report sent to the Creditors Committee by a RMS accountant indicates that RMS paid All Advertising in excess of $200,000 in satisfaction of CGS–NY's debts, and that RMS received nothing in return. *See* accountant's report, annexed to the Silver Supp.Aff. as Exh. "F."

In November 1985, the Bankruptcy Court approved RMS's plan of reorganization, which was to provide approved creditors with 100 cents on the dollar. Subsequently, on April 22, 1988, Silver wrote a letter to counsel for All Advertising, indicating that "[t]he [Creditors] [C]ommittee has taken the position that Marshall's [Koplitz's] actions were ultra vires, and that this plus other similar deals represented a fraud against creditors in our bankruptcy action and were a preferential treatment of creditors." *See* letter from Silver to Herman Goldner, counsel for All Advertising, of 4/22/88, at 2, annexed to the Lino Aff. as Exh. "L." Silver indicated further that "[t]he [Creditors] [C]ommittee wants me to proceed with litigation against All Advertising...." *Id.*

## VI. The Instant Litigation

On October 3, 1988, plaintiff commenced the instant litigation and, thereafter, filed an amended complaint. In its First and Second Causes of Action, plaintiff alleges that, at the time that the Cunard Credits were delivered to All Advertising, defendants knew that the credits were plaintiff's property and that plaintiff was not indebted to either All Advertising or Lino. Plaintiff alleges further that defendants were aware that Koplitz was without authority to deliver the Cunard Credits for the benefit of any entity other than the plaintiff. Accordingly, plaintiff alleges that defendants All Advertising and Lino were unjustly enriched, in the amount of $388,482.90, by the transfer of the Cunard Credits to them.

In its Third Cause of Action, plaintiff alleges that All Advertising and Lino entered into an oral agreement with RMS to engage in reciprocal trading, and to maintain a running account of each party's transactions with the other. Plaintiff alleges further that All Advertising and Lino breached this oral contract by refusing to pay $377,145.72 owed to RMS.[10] In its Fourth Cause of Action, plaintiff alleges that defendant Lino Associates is a mere shell, completely controlled by defendant Lino, and is the recipient of the property and assets of defendant All Advertising, rendering All Advertising completely insolvent. As a result, plaintiff alleges that Lino Associates is responsible for the debts of All Advertising and Lino.

While this action was pending, RMS failed to perform according to its plan of reorganization. In a March 12, 1992 letter, counsel

---

**10.** The $377,145.72 is equal to the value of the Cunard Credits ($388,482.90), minus approximately $11,000, which represents the value of a counterclaim.

for the Creditors Committee advised RMS creditors that (1) RMS had closed its doors; (2) the creditors will receive no further payments from RMS; and (3) the creditors should write their claims off on their business records. The letter indicated further that Silver had personally acquired RMS's assets, including the claims asserted in this action. *See* letter from Wanda Borges to creditors of 3/12/92, annexed to the Boneberg Aff. as Exh. "M."

The defendants now move for an order, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, dismissing plaintiff's amended complaint on the grounds that (1) RMS should be judicially estopped from bringing this suit because it failed to disclose the existence of the claims sued upon herein to the Bankruptcy Court and its creditors; and (2) the suit fails on the merits of the claim, as the transfer of the Cunard Credits to All Advertising was fully supported by consideration.

## DISCUSSION

### I. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–1609, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir.1988); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. at 330, n. 2, 106 S.Ct. at 2556, n. 2 (Brennan, J., dissenting). In sum, if the Court determines

that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1969)); *see also Weg v. Macchiarola*, 654 F.Supp. 1189, 1191–92 (S.D.N.Y.1987).

## II. Judicial Estoppel

■■■ The doctrine of judicial estoppel prevents a party from taking inconsistent positions in subsequent legal proceedings. *In re Galerie des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr.S.D.N.Y.1985), *aff'd*, 62 B.R. 224 (S.D.N.Y.1986). The object is to safeguard the administration of justice by preventing litigants from playing "fast and loose" with the courts. *Id.* at 260 (citing *Melton v. Anderson*, 32 Tenn.App. 335, 222 S.W.2d 666, 669 (1948)); *see also Young v. United States Dep't of Justice*, 882 F.2d 633, 639 (2d Cir.1989), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990).

Nevertheless, the circumstances under which the doctrine is to be applied are not clear. *Young v. United States Dep't of Justice*, 882 F.2d at 639. Indeed, there is some dispute as to whether judicial estoppel is a viable doctrine in this Circuit. *See In re Roundabout Theatre Co.*, 131 B.R. 14, 18 n. 4. (S.D.N.Y.1991); *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752, 763 n. 6 (S.D.N.Y.1988); *United States v. Starrett City Assocs.*, 605 F.Supp. 262, 263 (E.D.N.Y. 1985). Accordingly, the doctrine has only been invoked in "extreme cases in which the inconsistent positions have been the product of fraud or other deliberately misleading conduct." *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. at 763.

Defendants contend that RMS is judicially estopped from bringing this action because it failed to disclose the nature of its claims in the prior bankruptcy proceeding. Section 521(1) of the Bankruptcy Code requires a debtor in bankruptcy to "file a . . . schedule of assets and liabilities . . . and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). The Code provides further that a debtor seeking protection under Chapter 11 must file a disclosure statement containing "adequate information." 11 U.S.C. § 1125(b). Adequate information is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1). It is thus well established that a bankrupt must create a schedule for the benefit of its creditors of all of its interests and property rights, including any litigation likely to arise in a non-bankruptcy contest. *See Pako Corp. v. Citytrust*, 109 B.R. 368, 372 (D.Minn.1989). According to the defendants, RMS failed to disclose to its creditors the existence of potential claims against the defendants, thereby estopping plaintiff from litigating this action.

■■■ Assuming, without deciding, that the doctrine of judicial estoppel is recognized in this Circuit, the Court finds that the defendants have failed to establish that plaintiff should be estopped from prosecuting this action. In order to assert a defense based on the doctrine of judicial estoppel, a party must show:

> (1) an unequivocal assertion of law or fact by one party in one judicial proceeding, (2) the assertion by that party of an intentionally inconsistent position of law or fact in a subsequent judicial proceeding, (3) in order to mislead the court and obtain unfair advantage as against another party.

*In re Roundabout Theatre Co.*, 131 B.R. at 18 (citing *United States v. Starrett City Assocs.*, 605 F.Supp. at 264).[11]

11. The defendants contend that this three-part test for invoking judicial estoppel is inapplicable as plaintiff had an affirmative duty to disclose its claim in bankruptcy. The Court disagrees. In *Roundabout Theatre*, this Court applied the three-part test in determining whether the claim of a former director for pre- and post-petition wages was barred by the doctrine of judicial estoppel

The defendants have failed to set forth any evidence of RMS's deliberate intention either to mislead the Bankruptcy Court or to obtain unfair advantage. As RMS's reorganization plan provided for all approved creditors to receive the full value of their claims, this is not a case in which RMS sought to conceal potential recoveries in order to induce creditors to accept a compromise.[12]

Additionally, although plaintiff failed to name the defendants or detail the nature of this action in its bankruptcy disclosures, plaintiff did not conceal that it had certain claims arising out of Koplitz's wrongful transfer of assets from RMS to CGS–NY. Moreover, while the disclosure statement provided to the Bankruptcy Court did not indicate the existence of any claims against particular parties, RMS did disclose in its financial statements that it had expended more than $400,000 on behalf of CGS–NY.

Specifically, in financial statements submitted by RMS to the Bankruptcy Court, RMS set forth as an asset a contingent liability due from Koplitz in the amount of $440,576.00, which RMS stated "represents expenditures by the Company for the direct benefit of Convention Group Specialists. According to management, these expenditures were soley [sic] for the benefit of Convention Group Specialists which is wholly owned by Marshall Koplitz." *See* Financial Statement as of 1/31/85, at 6; Financial Statement as of 10/31/85, at 7; Financial Statement as of 1/31/87, at 6 (collectively, the "Financial Statements"), annexed to the Silver Aff. as

Exh. "A." Moreover, the accountant's report sent to the Creditors Committee indicated that RMS paid All Advertising in excess of $200,000 in satisfaction of CGS–NY's debts.[13] Accordingly, the defendants' argument that the Creditors Committee was unaware of any potential claims arising out of Koplitz's wrongful transfer of assets from RMS to CGS–NY lacks merit. As a result, the defendants' motion for summary judgment on the grounds of judicial estoppel is denied.

### III. Failure of Proof

Defendants also move for summary judgment dismissing the complaint on the grounds that the suit fails on the merits. Defendants contend that there are no material facts in dispute regarding the manner in which the Credits Transaction was effected and the fact that RMS received rights to the All Trade Credits in exchange for relinquishing its rights to the Cunard Credits. Thus, as the Credits Transaction was a *bona fide* agreement, defendants argue that RMS's attempt to recover funds from All Advertising must fail as a matter of law. The Court disagrees.

■ Contrary to defendants' argument, there are several material issues that are in dispute, precluding summary judgment as a matter of law. First, while defendants claim that the Cunard Credits were held jointly for the benefit of both RMS and All Advertising, RMS contends that it executed the Cunard Credits solely for its own benefit, and that

---

where the director had failed to set forth his claim in a schedule of liabilities filed on behalf of the debtor. *See In re Roundabout Theatre*, 131 B.R. at 18. Thus, the three-part standard is applicable in the bankruptcy context.

The defendants contend further that this standard is incorrect as it adds the elements of intentional wrongdoing and prejudice to a finding of judicial estoppel. While the Court agrees that the defendant need not show prejudice, *see In re Galerie des Monnaies of Geneva, Ltd.*, 55 B.R. at 260, the Court finds that intentional misconduct is a necessary element to a claim for judicial estoppel. *See Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 n. 6 (8th Cir.1987) (finding that judicial estoppel requires a "knowing misrepresentation to or even fraud on the court"); *In re Neptune World Wide Moving, Inc.*, 111 B.R. 457, 461 (Bankr.S.D.N.Y.1990) (applying judicial estoppel only where " 'intentional self-contra-

diction is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice' ") (quoting *Scarino v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir.1953)).

**12.** While the defendants emphasize the fact that the reorganization ultimately failed, the Court finds that this failure is irrelevant to whether RMS's pre-confirmation disclosures were complete.

**13.** Although defendants argue that the accountant's report is "inadmissible triple hearsay," *see* Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment, the Court finds that the report is evidence of whether the Creditors Committee knew of potential claims against the defendants, even though the report is not evidence of the truth of those claims.

the trade did not include All Advertising. In support of its contention, plaintiff has provided the Court with several documents indicating that RMS paid for the VCRs. Defendant Lino has merely asserted, however, that the joint agreement to split the Cunard transaction was "completed and was carried on the All Advertising and RMS books." Lino Aff., ¶ 28. Defendants have not provided any documents indicating that All Advertising paid either General Electric Company or RMS its share of the purchase price for the VCRs. Defendants have also failed to provide any support for their proposition that the Cunard Credits were to be jointly held for the benefit of RMS and All Advertising.

■ Second, although defendants assert that CGS–NY was holding the All Trade Credits on behalf of All Advertising for "tax reasons," defendants have not provided the Court with any documents evidencing this arrangement. Similarly, while defendants claim that CGS–NY reflected All Advertising's ownership of the All Trade Credits as a liability on its books, they have failed to submit proof that CGS–NY's books evidence All Advertising's ownership of the All Trade Credits. In fact, CGS–NY's statements of account merely reflect that it owed All Advertising a certain sum of money, not that CGS–NY was holding credits on All Advertising's behalf.

■ Third, there is a genuine issue of fact in dispute as to whether an authorized agent of RMS notified All Advertising that CGS–NY had merged with RMS. As plaintiff claims that this merger never took place, and as defendants have not submitted any evidence that the merger actually occurred, the crucial issue is whether it was reasonable for All Advertising to believe that CGS–NY and RMS were acting as one entity.

■ Fourth, and most importantly, whether RMS received consideration for trading the Cunard Credits is a disputed issue of fact. According to the defendants, RMS and All Advertising agreed that RMS would retain rights to the All Trade Credits in consideration for transferring its half of the Cunard Credits to All Advertising. In support of their contention, defendants have submitted a written reconciliation undertaken by the accounting staffs of All Advertising and RMS on February 27, 1984. Plaintiff discounts the reconciliation as evidence of the Credits Transaction, arguing that the reconciliation was not prepared in the ordinary course of business, and that Kobel was not authorized to execute such a document on behalf of RMS. In fact, plaintiff claims that Kobel admitted that the reconciliation was a "secret agreement," executed in a "spylike" fashion. Plaintiff also claims, without proving, that the reconciliation does not accurately reflect information contained in RMS's books and records.

■ Furthermore, defendants point to a "trade available form," which details the trade credits available in RMS's inventory and indicates that, in 1983, RMS had available credits from Costa Lines and Cunard Lines. Defendants argue that, as RMS did not have a direct relationship with either of these companies, the trade available form is evidence that RMS had acquired the All Trade Credits and was using them in its business. Nevertheless, Silver contends that RMS does, indeed, have direct trade agreements with both Costa Lines and Cunard Lines, and that he personally traded on these agreements on several occasions.

In light of the foregoing disputed issues of fact, the Court finds that summary judgment is inappropriate. Accordingly, defendants' motion is denied.

## CONCLUSION

For the reasons set forth above, defendants' motion, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, for summary judgment dismissing the amended complaint is denied. The parties are directed to finish any remaining discovery and to submit a joint pre-trial order to the Court on or before March 31, 1994. In addition, the parties are directed to appear for a pre-trial conference on April 13, 1994, at 10:30 a.m.

SO ORDERED.