In re **RHYTHMS NETCONNECTIONS INC., et al., Debtors.**

**Rhythms NetConnections Inc., et al., Plaintiff,**

v.

**Cisco Systems Inc. and Cisco Systems Capital Corporation, Defendants.**

**Bankruptcy Nos. 01–14283 (BRL), to 01–14287(BRL).**

**Adversary No. 03–06136(BRL).**

United States Bankruptcy Court, S.D. New York.

Sept. 24, 2003.

Brownstein Hyatt & Farber, P.C., Denver, CO, By Michael J. Pankow, Esq., Scarcella, Rosen & Slome, LLP., Uniondale, NY, By Lon J. Seidman, Esq., for Plaintiff/Debtor.

Carter, Ledyard & Milburn, New York City, By James Gadsden, Esq., for Defendants, Cisco Systems Inc. and Cisco Systems Capital Corporation.

### MEMORANDUM DECISION DENYING MOTION TO DISMISS COMPLAINT

BURTON R. LIFLAND, Bankruptcy Judge.

Rhythms NetConnections Inc. and its wholly-owned U.S. subsidiaries (collectively, the "Debtors" or "Rhythms"), commenced this adversary proceeding against Cisco Systems Inc. and Cisco Systems Capital Corporation (collectively, the "Defendants" or "Cisco"), seeking to recover certain prepetition payments by the Debtors to the Defendants. The Debtors assert that the payments are avoidable transfers pursuant to sections 547 and 550 of title 11, United States Code (the "Bankruptcy Code"). The Defendants move to dismiss the Debtors' complaint pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), as incorporated by rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for failure to state a claim upon which relief can be granted.

### Background

The Debtors were telecommunications companies that provided broadband local access communication services to businesses and consumers. The Debtors filed their petitions under chapter 11 of the Bankruptcy Code on August 1, 2001 (the "Petition Date") pursuant to an agreement with certain of their creditors.[1]

Prior to the Petition Date, the Debtors' and Cisco's business relations intersected on multiple levels. The Debtors provided network services to Cisco employees under the Enterprise Services Solution Agreement dated December 2, 1998, as amended

---

1. The Debtors had long-term debt obligations arising under three issues of notes which aggregated $915 million principal amount at maturity. In the spring of 2001, an ad hoc committee of noteholders (the "Noteholders' Committee") was organized and the Debtors reached an agreement (the "Voting Agreement") with the Noteholders' Committee regarding a process for reorganizing or liquidating the Debtors and sharing the proceeds realized therefrom. Pursuant to the Voting Agreement, the Debtors agreed to commence the Chapter 11 cases and to immediately file a motion to receive bids for either an investment sufficient to accomplish a stand-alone reorganization, or for a sale of all or most of the assets of the Debtors. An auction was to occur no later than 45 days after the Petition Date. Under the terms of the Voting Agreement, the Debtor would provide the required 31–day advance notice of termination of service to its customers on or before August 10, 2001 pursuant to Federal Communications Commission (the "FCC") regulations, and would reduce their "cash burn rate."

on March 1, 2001 (the "Services Agreement"), and in addition, Rhythms and Cisco were parties to the Master Lease Agreement No. 2324, dated April 5, 1999, as amended (the "MLA"), which was modified from time to time by the addition of various schedules for the lease of equipment from Cisco to Rhythms and maintenance related to such equipment. According to the Complaint, Rhythms made eight transfers to Cisco within the 90 days prior to the Petition Date (the "Preference Period"), totaling approximately $2.4 million.

On the Petition Date, Rhythms immediately moved for, among other things, authority to sell all of its assets (the "Sale Motion") and authority to send the notice of termination of service to all of its customers.[2] On September 7, 2001, WorldCom, Inc. ("WorldCom"), submitted a proposal to purchase certain assets and executory contracts of the Debtors. Cisco objected to the Sale Motion and the WorldCom proposal and also filed a proof of claim describing approximately $69.7 million in damages arising out of the Debtors' rejection of the MLA. After negotiation between the parties, this Court approved the Order Resolving the Contracts and Claims of the Cisco Companies (the "Settlement Order") on September 25, 2001.

The Settlement Order provided that a resolution of Cisco's rights against the Debtors, as well as a determination of Cisco's claims against the Debtors, were necessary before the proposed sale of the Debtors' assets (the "Asset Sale") to WorldCom could be approved. The Settlement Order authorized the rejection of all Cisco Contracts except the Services Agreement, which would be effectively rejected upon the earliest occurrence of certain events relating to the closing or termination of the Asset Sale. In the event of a closing of the Asset Sale, Cisco was allowed an administrative expense claim in the amount of $5,810,000 less any sums due under the Services Agreement. Cisco was allowed a general unsecured claim against the Debtor's estate in the amount of $25,000,000 in satisfaction of all general unsecured claims that it may have arising out of contracts with the Debtors, or the rejection thereof. The Settlement Order further provided that claims allowed pursuant to the Settlement Order are not subject to reconsideration under section 502(j) "or otherwise." Cisco was also granted relief from the automatic stay to recover certain equipment and property. Finally, the Settlement Order conditioned the adjustment of Cisco's claims upon the closing of the Asset Sale. If the Asset Sale did not close, both parties would have been "returned to their prior rights."

The Asset Sale closed on December 3, 2001. On July 14, 2003, the Debtors commenced this adversary proceeding seeking to avoid $2.4 million in preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code. The Defendants assert that the Debtors are precluded from prosecuting the avoidance action because they failed to reserve the right to bring

---

**2.** On August 9, 2001, the Debtors notified their customers that service would be terminated on September 10, 2001 unless an acceptable bid was received. While the Debtors were engaged in the sale process, the official committee of unsecured creditors (the "Creditors' Committee") filed a motion on September 7, 2001 to require the Debtors to terminate service and to cease funding operating losses. Also on that date, the FCC denied the emergency petition of the Debtors to discontinue service. On September 10, 2001, the U.S. District Court for the Southern District of New York stayed proceedings on the Creditors' Committee's motion pending a withdrawal of the reference to the District Court. As required by the FCC, the Debtors continued operations until the FCC authorized the discontinuation of service effective September 24, 2001.

such action at the time they negotiated the Settlement Order. Further, Cisco urges this Court to follow certain decisions holding that a Debtor is precluded, under section 502(d) of the Bankruptcy Code, from pursuing a preference action after the creditor's claim has been allowed. Finally, Cisco asserts that Rhythms is judicially and/or equitably estopped from pursuing its claims.

### Discussion

■ Federal Rule 12(b)(6), which is made applicable to this proceeding by Bankruptcy Rule 7012(b), enables a defendant to move to dismiss a complaint on the ground that it fails to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6); Fed. R. Bankr.P. 7012(b). In reviewing a motion to dismiss, a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial. *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664 (Bankr.S.D.N.Y.2000) *aff'd* 264 B.R. 303 (S.D.N.Y.2001). A motion to dismiss must be denied unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pled factual allegations must be read by the court as true and construed in a light most favorable to the plaintiff. *Conley v. Gibson*, 355 U.S. at 47, 78 S.Ct. 99.

Cisco argues that section 502(d) precludes avoidance actions against a creditor after that creditor's claim has been allowed. For its position, Cisco relies upon certain decisions that construe section 502(d) as preclusive. *See Caliolo v. Azdel, Inc. (In re Cambridge Indus. Holdings, Inc.)*, 2003 WL 21697190 (Bankr.D.Del. 2003) ("*Cambridge II*"); *Caliolo v. TKA Fabco Corp. (In re Cambridge Indus. Holdings, Inc.)*, 2003 WL 1818177 (Bankr.

D.Del.2003) ("*Cambridge I*"); *LaRoche Indus., Inc. v. General Amer. Transp. Corp. (In re LaRoche Indus., Inc.)*, 284 B.R. 406 (Bankr.D.Del.2002) ("*LaRoche*"). First, the Delaware bankruptcy court decisions are not without well-reasoned disagreement. *See Peltz v. Gulfcoast Workstation Group (In re Bridge Info. Sys., Inc.)*, 293 B.R. 479 (Bankr.E.D.Mo.2003) ("*Bridge*") (debtor's preference action not precluded by section 502(d), when debtor does not object to creditor's claim under the same section). Second, the decisions discussed by Cisco in its motion are factually distinguishable from this case.

The Delaware cases base their interpretation of section 502(d), in part, upon language in *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (interpreting section 57(g) of the Bankruptcy Act of 1898, the precursor to section 502(d)). However, the question in *Katchen* was whether a bankruptcy referee had summary jurisdiction to rule on a preference action without a jury trial, where the trustee objected to the transferee's claim pursuant to section 57(g). *Katchen* at 326–27, 86 S.Ct. 467. As noted by the *Bridge* Court, *Katchen* does not support *LaRoche* and *Cambridge I* because:

> The issue of whether a debtor who fails to object to a creditor's claim based on § 502(d) is precluded from later asserting a preference action against the creditor was simply not at issue in *Katchen*. The entire basis of the Supreme Court's analysis centers on the relationship between a preference action and the claims allowance process when the trustee advances an objection under § 502(d). Thus, this court finds that *Katchen* does not support the *LaRoche* and *Cambridge[I]* conclusion that § 502(d) extinguishes any preference against a credi-

tor once that creditor's claim is allowed under either §§ 502(a) or 502(b).

*Bridge,* 293 B.R. at 488.

Section 502(d) is intended to coerce creditors to comply with judicial orders. It merely "preclude[s] entities which have received voidable transfers from sharing in the distribution of the assets of the estate unless and until the voidable transfer has been returned to the estate." *In re Mid Atlantic Fund, Inc.,* 60 B.R. 604, 609 (Bankr.S.D.N.Y.1986). Section 502(d) "is designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate." *Holloway v. I.R.S. (In re Odom Antennas, Inc.),* 340 F.3d 705, 708 (8th Cir.2003) (citations omitted). Therefore, this Court agrees with the *Bridge* Court that:

> The better position is that § 502(d) is in essence an affirmative defense to a creditor's claim against the estate. Thus, § 502(d) is only applicable when the debtor in possession actually interposes an objection to a claim under § 502(d). Therefore, if the debtor in possession does not assert an objection to a creditor's claim under § 502(d), that section is simply not at issue and does not bar a subsequent preference action against the creditor.

*Bridge,* 293 B.R. at 488 (citations omitted); *contra Microage, Inc. v. Viewsonic Corp. (In re Microage, Inc.),* 291 B.R. 503 (9th Cir. BAP 2002); *Service Plastics, Inc. v. Cameo Container Corp. (In re Service Plastics, Inc.),* 1997 WL 657119 (Bankr. N.D.Ill.1997).

Moreover, the cases Cisco relies upon are factually distinguishable from this one. Generally those courts have argued that in fairness to creditors, a debtor should not be allowed to conceal a preference action during claims litigation. *In Cambridge I,*

the Court stated that a Debtor should not be permitted to "sandbag" its creditors by:

> objecting to and obtaining a stipulated order allowing the claim in a reduced amount and, after the claim objection has been resolved, commencing an adversary proceeding alleging that the creditor received an avoidable preference.

*Cambridge I* 2003 WL 1818177 at \*2. *See also In re Microage* at 513 (after negotiating claims amount for more than a year, debtor first raised avoidance issue under section 502(d) in response to motion to compel payment under the approved settlement); *LaRoche* at 410; *In re Service Plastics* at \*10 (debtor could not assert section 502(d) against creditor's allowed claim after statute of limitations for commencing avoiding power actions had run); *Cambridge II* at \*3 (debtor filed a preference action before creditor filed its proof of claim, allowing enough time to combine and determine both cases concurrently). Here, the Settlement was signed less than two months after the Petition Date, at a time when the Debtors were struggling with, among other things, an urgent sale of assets, the termination of service and emergency petitions to the Federal Communications Commission, and a daily effort to conserve their remaining cash assets for the benefit of creditors. The Debtors and their statutory Creditors' Committee were in triage and were far from a point where they could be expected to have commenced a preference analysis or a claims review. Instead, in connection with the approval of the Asset Sale, the Debtors had to negotiate settlements with, other than Cisco, GATX Corp. and certain incumbent local exchange carriers in order to resolve issues relating to the Asset Sale and to fix claims of those entities. Without fixing the pre-petition cure amounts owed to those parties, the Asset Sale could not have effectively proceeded.

■ Cisco also asserts that it "relied on its agreements with the Debtors as embodied in the Settlement Order." (Motion ¶ 10). The Settlement Order contains no language upon which such reliance could be based. It includes no release of any claims against Cisco, avoidance or otherwise. If Cisco meant to obtain a release in return for its agreement, it easily could have included language to that effect in the Settlement Order. The Settlement Order, however, is unambiguous. *See American Home Products Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2nd Cir.1984) (where the language of an agreement permits only one reasonable interpretation, a court does not look further to ascertain its meaning). Furthermore, this Court rejects the notion that a settlement, even a "comprehensive" settlement, functions as an automatic release of any claims not provided for within the language of the settlement itself. *See Pereira v. Lehigh Sav. Bank, SLA (In re Artha Mgmt., Inc.)*, 174 B.R. 671 (Bankr.S.D.N.Y.1994) (rejecting argument that a settlement implicitly barred future preference actions).

■ Cisco also contends that because Rhythms did not reserve its right to avoid any preference payments in the Settlement Order, it has waived this right. (Motion ¶ 11). However, it was not necessary for Rhythms to explicitly reserve its right to pursue avoidance actions against Cisco in the Settlement Order. Any discussion of the possibility of avoidance actions, as well as any release of Cisco therefrom, are absent from the Settlement Order. As noted above, the Debtors were a mere two months into their Chapter 11 proceedings, attempting to limit the loss of hundreds of thousands of dollars per day and find a buyer for the business. The Debtors were nowhere near commencing preference analyses or the claims objection process when the Settlement Order was agreed

upon. Moreover, there is no requirement that preference claims be brought as compulsory counterclaims, even to a proof of claim. *See In re Artha Mgmt., Inc.*, 174 B.R. at 676; *Bonwit Teller, Inc. v. Jewelmasters Inc. (In re Hooker Inv., Inc.)*, 162 B.R. 426, 434 n. 7 (Bankr.S.D.N.Y.1993) (citing *Fonda Group, Inc. v. Contemporary Packaging Corp. (In re Fonda Group Inc.)*, 108 B.R. 962, 970 (Bankr.D.N.J. 1989)) ("A debtor is not required to assert an avoidable transfer as a counterclaim to a proof of claim, although the debtor is free to do so."). If Cisco's intent was to obtain a release from any further claims the Debtors may have against it, it could and should have explicitly provided for such release in the Settlement Agreement.

■ Cisco further argues that Rhythms is judicially and/or equitably estopped from pursuing its preference claims. However, "[a] careful distinction must be drawn between applying the principles of equitable or judicial estoppel and enforcing a document which is contractually binding." *In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215, 224 (Bankr.D.N.J.1996). Estoppel is not a basis to rewrite the Settlement Order, so as to effect the release that Cisco failed to include.

■ Judicial estoppel prevents a party from prevailing on one phase of a case on an argument and then adopting a contradictory argument in another phase. *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Cisco must show that 1) Rhythms took an inconsistent position in a prior proceeding regarding the avoidance claims, and 2) the Court adopted that position in some manner. *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir.2000); *accord Bethlehem Steel Corp. v. BP Energy Co. (In re Bethlehem Steel Corp.)*, 291 B.R. 260, 266 (Bankr.S.D.N.Y.2003). Cisco must also show that Rhythms engaged in

intentional misconduct. *Reciprocal Merch. Serv., Inc. v. All Advertising Assocs., Inc.,* 163 B.R. 689, 696 n. 11 (S.D.N.Y.1994); *In re Neptune World Wide Moving, Inc.,* 111 B.R. 457, 461 (Bankr.S.D.N.Y.1990).

Similarly, to establish the elements of equitable estoppel, Cisco must prove that Rhythms: 1) made a false representation or concealed material facts regarding the avoidance claims 2) intended or expected that Cisco would rely upon the alleged representation or concealment; and 3) Rhythms had actual or constructive knowledge of the real facts regarding the avoidance claims. *See In re Vebeliunas,* 332 F.3d 85, 93–4 (2nd Cir.2003) (citing *International Minerals & Res., S.A. v. Pappas,* 96 F.3d 586, 594 (2nd Cir.1996)). In addition, Cisco must prove: 1) its own lack of knowledge and the means of acquiring knowledge of the real facts regarding potential preference claims; 2) its own reasonable reliance on Rhythms' alleged conduct; and 3) a prejudicial change of position. *In re Vebeliunas* at 94; *see also In re Bethlehem Steel Corp.,* 291 B.R. 260, 265 (Bankr.S.D.N.Y.2003).

There exists nothing in the record to support Cisco's arguments for either judicial or equitable estoppel. Therefore, its motion to dismiss on these grounds must fail.

### Conclusion

For the above reasons, the motion to dismiss is denied. Defendants shall serve and file their answer within the time stipulated on the September 17, 2003 hearing on this motion.

It is so Ordered.