UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOS-
ERS, AUTHORS AND PUBLISH-
ERS, et al., Defendants.

In the Matter of the Applications of FOX
BROADCASTING COMPANY and Fox
Television Stations, Inc., Applicants.

Civ. A. No. 13–95 (WCC).

United States District Court,
S.D. New York.

Jan. 3, 1995.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Jay Topkis, of counsel), Bernard Korman, American Soc. of Composers Authors and Publishers, New York City, (Richard H. Reimer, of counsel), for American Soc. of Composers, Authors and Publishers.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. Washington, DC (Bruce D. Sokler, Peter Kimm, Jr., Lisa W. Schoenthaler, of counsel), Weil, Gotshal & Manges, New York City (R. Bruce Rich, of counsel), for All–Industry Television Station Music License Committee.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for Applicants Fox Broadcasting Co. and Fox Television Stations, Inc.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This application is before this Court in its capacity as the "rate court" under the Amended Consent Judgment ("Consent Decree") entered in *United States v. American Society of Composers, Authors and Publishers*, 1950–51 Trade Cases (CCH) ¶ 62,595 (S.D.N.Y.1950). The Consent Decree, originally entered in 1941 and extensively amended in 1950, settled the United States' antitrust suit against the American Society of Composers, Authors and Publishers ("AS-CAP"). This Court has retained jurisdiction under Article XVII of the Consent Decree to oversee its ongoing implementation. Article

IX of the Consent Decree provides that if ASCAP and a user of music in its repertory are unable to agree on a fee for the right to perform ASCAP music, the music user may apply to this Court for "the determination of a reasonable fee." We may, of course, also determine the threshold matter of whether ASCAP is entitled to any fee from a particular user.

ASCAP is an unincorporated membership society of over 50,000 music composers, lyricists and publishers who own the copyrights to more than three million musical compositions. Each member has granted ASCAP a non-exclusive right to license the public performance rights to his or her compositions. ASCAP serves as licensing agent and as a collector and distributor of royalties. It licenses performances by a wide variety of music users, including television and radio networks and stations, cable program services, restaurants, clubs, and bars. ASCAP surveys tens of thousands of hours of television and radio broadcasts each year in an attempt to monitor the public performances of its members' music and to ensure that those performances are licensed.

The applicants in this proceeding are Fox Broadcasting Company ("Fox"), a corporation that acquires and distributes television programming by satellite transmission to the approximately 134 television stations with which it has contractual relationships (the "Fox affiliates"), and Fox Television Stations, Inc., a corporation that owns and operates eight television stations (the "O & Os"). The O & Os and the Fox affiliates operate in the same way: they broadcast some programming supplied by Fox and fill up the rest of the broadcast day with syndicated programming, which is produced and distributed by independent companies, and with locally-produced programming. For the purposes of this opinion, the affiliated stations and the O & Os are similarly situated and we will not distinguish between them. All references to the "Fox affiliates" or the "Fox stations" should be understood to include the eight O & Os.

Fox seeks a determination that it is not required to obtain a license from ASCAP for the satellite transmission of its programs to its affiliates and O & Os. In the alternative, if we determine that it must obtain a license from ASCAP, Fox asks this Court to set a reasonable fee for its music use. For the reasons set forth below, we hold that ASCAP is not entitled to collect license fees for the use of music in its repertory in Fox programs broadcast between Fox's inception in 1986 and December 31, 1995, and that, even if it were, the reasonable amount of that fee would be $0. Beginning in 1996, ASCAP may negotiate a license agreement directly with Fox, but it must commensurately reduce the license fees paid by local stations owned by Fox or contractually affiliated with Fox.

## BACKGROUND

### A. The Consent Decree

Because ASCAP pools its members' copyrights, thereby enhancing their bargaining power in negotiations with music users, the United States Department of Justice filed suit in 1941 against ASCAP for alleged antitrust violations. The suit was quickly settled by the entry of the Consent Decree, which imposed certain limitations on ASCAP's operation. *See United States v. American Society of Composers, Authors and Publishers,* 1940–43 Trade Cases (CCH) ¶ 56,104 (S.D.N.Y.1941). The Decree was amended in 1950, in part as a response to the development of television and the corresponding increase in music use on television programming. *See United States v. American Society of Composers, Authors and Publishers,* 1950–51 Trade Cases (CCH) ¶ 62,595 (S.D.N.Y.1950); *United States v. American Society of Composers, Authors and Publishers/Application of Turner Broadcasting System, Inc.,* 782 F.Supp. 778, 791 (S.D.N.Y. 1991) (*"Turner Broadcasting"*), *aff'd,* 956 F.2d 21 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1950, 118 L.Ed.2d 554 (1992).

In broad terms, the Consent Decree permits ASCAP to hold only a non-exclusive right to license public performances. The members retain the right to negotiate with music users directly—so-called "source" or "direct" licensing—or to assign that role to another entity. The Consent Decree requires ASCAP to offer both blanket and per-

program licenses. A blanket license grants the licensee the right to use any composition in ASCAP's repertory at any time and as many times as the user wishes during the term of the license. *See* Art. VI, Consent Decree. A per-program license grants the licensee the right to perform any of ASCAP's compositions as many times as the user wishes, but the user pays license fees only for those programs in which it actually uses ASCAP music. *See* Art. VII(B), Consent Decree.

Specifically with respect to television broadcasting, the Consent Decree directs ASCAP to issue to a "telecasting network," a term that is not defined in the Consent Decree, a license

> on terms which authorize the simultaneous and so-called "delayed" performance by ... telecasting ... of the ASCAP repertory by any, some or all of the stations in the United States affiliated with such ... television network ... and do not require a separate license for each station ... for such performance.

*See* Art. V(A), Consent Decree. This license is referred to as a "through-to-the-viewer" license. Under this provision, each network negotiates a license fee for the use of music in the programs that are broadcast through its affiliates and O & Os. That license covers both the delivery of the programs to the network stations and the broadcast of the programs to the viewing public. Radio broadcast networks and music services like Muzak are licensed in the same way, while most other music users negotiate blanket (or more rarely per-program) licenses to cover the ASCAP music that they provide directly to the public.

If ASCAP and a music user are unable to agree on a license fee, Article IX(A) of the Consent Decree provides that the music user may apply to this Court for the determination of a reasonable fee. While that proceeding is pending, either party may request that the Court set an interim license fee. The music user must pay that fee, subject to later adjustment once the final fee has been set. If the music user does not pay the interim fee, its application may be dismissed. *See* Art. IX(B), Consent Decree.

The Consent Decree also contains an anti-discrimination provision that prohibits ASCAP from "[e]ntering into, recognizing, enforcing or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licenses similarly situated." *See* Art. IV(C), Consent Decree.

**B. Prior Licenses to the Television Broadcasting Industry**

The history of ASCAP's negotiations with the television broadcasting industry is extensive. Since 1949, ASCAP has licensed both the networks and the approximately 1000 local television stations. Until recently, it was generally agreed that there were three networks respectively owned by National Broadcasting Company ("NBC"), Capital Cities/ABC, Inc. ("ABC"), and CBS Inc. ("CBS"). Each network negotiates through-to-the-viewer licenses for the programming that it provides to its O & Os and affiliated stations. The local television stations, each broadcasting within a limited geographical area, fall into three categories: network affiliated stations, O & Os, and independent stations. Both O & Os and network affiliated stations carry some network programming, which is covered by the network's license. The remainder of their broadcast day consists of syndicated programming and locally-produced programming. Independent stations carry only syndicated and local programming. The local stations pay ASCAP license fees only for the portion of their programming that is not received from the networks.

**1. ABC, NBC and CBS**

Although ASCAP has entered into various blanket licensing agreements with ABC, CBS and NBC on a through-to-the-viewer basis since 1949, its relationship with the networks has frequently been contentious. Throughout the 1970s and 1980s, for example, the networks operated under interim fee agreements for long periods before either reaching a negotiated settlement retrospectively finalizing fees—as NBC did in 1992 for the period from 1976 to 1991—or having their fee dis-

putes resolved by this court—as was the case for CBS for the period 1991 to 1993 and for ABC for the period 1986 to 1993. *See United States v. American Society of Composers, Authors and Publishers/Applications of Capital Cities/ABC, Inc. and CBS Inc.,* 831 F.Supp. 137, 143 (S.D.N.Y.1993). After the retrospective final fee was set, the amount that the networks had paid in interim fees was adjusted to reflect any disparity between the final fee and the interim fee.

### 2. The Local Stations

The negotiating history of the local stations is also complex. Historically, ASCAP has licensed the local stations, almost without exception, as a group. The stations then apportioned the total blanket license fee among themselves. Although all of the local stations pay per-program fees according to the same formula, the amount that each station pays reflects the music use in each individual station's programming. The All–Industry Television Station Music License Committee (the "Committee") has long represented the local stations in negotiations with ASCAP.

In 1949, ASCAP and the local stations agreed on a blanket license, modelled on an already-existing radio license, that called for a fee based upon a set percentage of the stations' combined gross revenues. Although the local stations were also interested in per-program licenses, they were unable to reach agreement with ASCAP and, in July 1951, brought a rate proceeding in this Court. *See United States v. American Society of Composers, Authors and Publishers/Application of Voice of Alabama, Inc.,* Civ. No. 13–95 (S.D.N.Y.1951). Before any opinion issued, however, the parties agreed on a new set of licenses. These licenses (the "*Voice of Alabama* licenses") began in 1954, terminated in 1961, and provided for a blanket license fee based on a percentage of the station's revenues and a per-program license fee based on a percentage of the net revenues of programs using ASCAP music.

By late 1960, saddled with increasing license fees because of rising station revenues, the local stations applied to the rate court once again. In *United States v. American Society of Composers, Authors and Publishers/Application of Shenandoah Valley Broadcasting, Inc.,* No. Civ. 13–95 (S.D.N.Y. 1961), they sought to compel ASCAP to offer a license that would exclude pre-recorded syndicated programming from its coverage. This Court denied the stations' request, and the stations thereafter filed a second application for the determination of reasonable blanket and per-program license fees. In 1969, prior to adjudication, the parties agreed on a new set of blanket and per-program licenses (the "*Shenandoah* license"),[1] based on a different percentage of revenue formula. As compared with the *Voice of Alabama* license, the *Shenandoah* license was expected to save the stations about $53 million over its ten-year life. *See United States v. American Society of Composers, Authors and Publishers/Application of Buffalo Broadcasting Co., et al.,* No. Civ. 13–95, 1993 WL 60687, at *50 (S.D.N.Y. Mar. 1, 1993) (Dolinger, Mag. J.)

---

1. Because the terms of the *Shenandoah* license are crucial to our discussion below, we quote them at length here. Under this license, ASCAP grants a local television station "a license to perform [music in the ASCAP repertory] publicly by television broadcasting on Licensee's local television programs...." *See* Local Station Blanket Television License Agreement, ¶ 1A (the "*Shenandoah* license") (attached as Exhibit 1 to Letter from Bruce D. Sokler of October 30, 1992).
   "Local television program" is defined as "a program ... broadcast from the station other than a network television program of a 'regular national television network' ... or of an 'occasional television network' licensed by [ASCAP] at the source." *See Shenandoah* License, ¶ 2A.
   A "Network television program" is "a program ... broadcast simultaneously or by so-called 'delayed' or 'repeat' broadcasts ... over two or more affiliated stations." *See Shenandoah* License, ¶ 2B.

   "Regular national television network" is defined as "any television network which (a) has a minimum of one hundred affiliated stations and (b) supplies its affiliated stations with television programs which are broadcast by such affiliated stations on a regular basis for an average of not less than forty hours each week in any six month period during the term of this agreement." *See Shenandoah* License, ¶ 2E.

   An "Occasional television network" is "any group of two or more affiliated stations which is not a regular national television network...." *See Shenandoah* License, ¶ 2F.

("*Buffalo Broadcasting I*"). The *Shenandoah* license ran from 1968 through 1977.

Following the termination of the *Shenandoah* license in 1977, the local television stations again sought to decrease their license fees.[2] The parties agreed to extend the *Shenandoah* license through mid–1978, after which the local stations filed an unsuccessful antitrust challenge to ASCAP's use of the blanket license. *See Buffalo Broadcasting Co. v. ASCAP,* 546 F.Supp. 274 (S.D.N.Y. 1982), *rev'd,* 744 F.2d 917 (2d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). While that suit was pending, the parties agreed to various extensions of the *Shenandoah* license; its terms remained in effect through January 31, 1983. In 1984, approximately 960 local stations filed an application for the determination of reasonable blanket license fees for the period from February 1, 1983 through December 31, 1995 and reasonable per-program license fees for the period from April 1, 1985 through December 31, 1995. *See Buffalo Broadcasting I,* at *3. With the consent of the parties, we referred that application to Magistrate Judge Dolinger to sit as a district judge pursuant to 28 U.S.C. § 636(c).

The O & Os' bargaining and litigating history with ASCAP is somewhat different from that of the independent and network-affiliated local stations. In 1964 or 1965, the O & Os agreed to a fee formula similar to the fee paid by the other local stations, but based on slightly different revenue percentages. Thereafter, the O & Os allowed the Committee to take the lead in negotiations with ASCAP. For the period ending on December 31, 1977, the O & Os ultimately chose to agree to the *Shenandoah* formula applicable to the other local stations. After 1977, however, the O & Os reached no agreement with ASCAP. In 1987, NBC, ABC and CBS filed an application on behalf of their twenty O & Os seeking the determination of reasonable blanket license fees for the period from January 1, 1978 through December 31, 1995 and reasonable per-program license fees for the period from April 1, 1985 through December 31, 1995. *See Buffalo Broadcasting I,* at *3. After ASCAP declined to agree to the transfer of this application to Magistrate Judge Dolinger to sit as a district judge, we referred it to him to sit as a special master pursuant to 28 U.S.C. § 636(b)(2).

### 3. The *Buffalo Broadcasting* Proceeding

On September 16, 1987, Magistrate Judge Dolinger consolidated these applications for trial. After lengthy discovery, the trial began on December 10, 1990 and concluded on February 19, 1991. The local stations paid interim fees to ASCAP while this proceeding was pending, pursuant to the terms of the *Shenandoah* license. Approximately 260 stations were operating under the interim per-program license; the approximately 703 others were operating under the interim blanket license. On February 26, 1993, Magistrate Judge Dolinger issued his Opinion and Order, which was filed March 1, 1993, setting final blanket and per-program license fees for the local stations, including the O & Os.[3] By stipulation dated September 15, 1993, ASCAP and the local stations settled their disputes concerning fees for the blanket and per-program license periods through December 31, 1994. On January 6, 1994, Magistrate Judge Dolinger filed with this Court his Report as a Special Master for the O & Os and entered judgment on the final blanket and per-program fees for the other local stations. ASCAP filed with this Court objections to the Special Master's Report recommending fees for the O & Os and appealed directly to the Second Circuit the ruling setting fees for the other stations. Because the parties had agreed to fees for the periods through December 31, 1994, only the fees set for 1995 were subject to review. On July 11, 1994, the Second Circuit granted ASCAP's

2. Beginning in the mid–1970's, the stations' revenues grew at an unprecedented rate and exceeded the stations' projections, made in 1969, on which the negotiators involved in reaching the *Shenandoah* agreement had relied in accepting a percentage-of-revenue formula. *See Buffalo Broadcasting I,* at *25.

3. Magistrate Judge Dolinger issued subsequent rulings on May 27, 1993, June 30, 1993, and October 28, 1993 clarifying certain aspects of his February 26 opinion. He also approved stipulations entered by the parties on September 15, 1993 and January 6, 1994.

motion to defer argument on ASCAP's appeal until after we reviewed Magistrate Judge Dolinger's recommendations with respect to the O & Os.

We issued our opinion on September 2, 1994, adopting Magistrate Judge Dolinger's recommendation with respect to the O & Os' blanket fee for 1995, but vacating his determination of the O & Os' per-program fee for 1995 and remanding the issue for reconsideration in light of our opinion. *See United States v. American Society of Composers, Authors and Publishers/Applications of Capital Cities/ABC, Inc., CBS Inc. and National Broadcasting Company, Inc.*, 157 F.R.D. 173 (S.D.N.Y.1994). On September 26, 1994, the Second Circuit heard oral argument on ASCAP's appeal of Magistrate Judge Dolinger's ruling with respect to the other local stations, and reserved decision. That appeal is still pending.

### C. Fox's Application

Fox commenced operations in 1986. At that time, ASCAP treated Fox's programs in the same way that it handled syndicated programming—by licensing the programming at the local station level pursuant to the interim fee arrangement in place at that time for the local stations. In late 1991, ASCAP reconsidered this practice. It indicated its belief that Fox should apply for a license for the transmission of its programs to the Fox stations. Fox disagreed, believing that its programs were not subject to any license fees beyond those that its local stations were already paying under the interim fee agreement. ASCAP indicated that it would bring an action against Fox for copyright infringement unless Fox applied to this Court for a determination of whether ASCAP was entitled to fees from Fox. *See* Letter from Bruce D. Sokler to Bernard Korman of January 29, 1992, at 2.

In August 1992, therefore, Fox filed this application, seeking a determination of whether ASCAP could require it to obtain a license for the transmission of its programs to its affiliates and O & Os.[4] If this Court finds that ASCAP is entitled to a fee from Fox, Fox also asks that we set a reasonable fee and commensurately reduce the fees paid by its local stations. In letters dated October 6, 1992, ASCAP asked us to set an interim fee, while Fox sought to have its application referred to Magistrate Judge Dolinger to be consolidated with the *Buffalo Broadcasting* proceedings. At a conference held on October 9, 1992, we denied both of those requests. Further correspondence by counsel followed, and our opinion is based in part on the information contained therein.

### DISCUSSION

Fox's application does not present us with a standard rate-setting case. Instead, the crucial issue in this application is whether ASCAP is entitled to any license fee from Fox. We hold that ASCAP is not entitled to collect a fee from Fox for the transmission of Fox's programs to its affiliates, and that, even if it were, the reasonable retrospective fee would be $0. The music performances in Fox's programming were included in the license fees set for the local stations through the end of 1995, and ASCAP may not be paid two license fees for one broadcast of a musical performance to the viewing audience. Prospectively, Fox may indeed be a "network" that ASCAP should license on a through-to-the-viewer basis. If ASCAP wishes to license Fox as it does ABC, NBC and CBS, however, it must exclude revenue from Fox programs from the total revenues used to calculate the license fees collected from the local stations in order to reflect the fact that the Fox programs will no longer be licensed at the local level.

### A. The Parties' Positions

Fox's arguments primarily address ASCAP's demand for retrospective license fees. Fox contends that it need not be licensed on a through-to-the-viewer basis because its programming has already been licensed at the local level under the *Shenandoah* license

---

4. At that time, Fox had 131 affiliated stations and 7 O & Os and broadcast approximately 24-½ hours of programming per week. *See* Application of Fox Broadcasting Company, at 1. By February 4, 1994, Fox had grown to 134 affiliates and 8 O & Os and broadcast 35–40 hours of programming per week. *See* Letter from Bruce D. Sokler of February 4, 1994, at 2.

in effect on an interim basis while *Buffalo Broadcasting I* was pending. Fox maintains that the *Shenandoah* license covers both the transmission of its programs to its local stations and their broadcast to the viewing public, because Fox is neither a "regular national television network" nor an "occasional television network." Fox also contends that *Buffalo Broadcasting I* set fees for the local television stations that included the Fox programming being shown on those stations. ASCAP is therefore impermissibly seeking to be paid twice for the same broadcast. Alternatively, Fox argues that the transmission of its programs by satellite to its affiliates is not a "public performance" of the program under copyright law. If a musical composition is not being publicly performed, no license is necessary and ASCAP is not entitled to collect a fee.

Under either rationale, Fox contends that it does not need a license of its own for the satellite delivery portion of the broadcasting process. Fox points out that syndicators deliver their programming to local stations in the same fashion and that ASCAP has never tried to license them at the distribution level. Fox argues that ASCAP's attempt to require it and not the syndicators to pay license fees violates the anti-discrimination provision of the Consent Decree. *See* Art. IV(C), Consent Decree. Fox also argues that if this Court finds that Fox is required to pay a license fee for the transmission of its programs to its affiliates, and if we set reasonable blanket and per-program license fees for Fox, we must reduce the license fee paid by the local stations to reflect payment at the distribution level for music use in Fox programs. Otherwise, Fox contends, ASCAP would improperly receive two license fees for one music use.

In arguments addressed primarily to the issue of retrospective fees, ASCAP counters that Fox performed its music publicly when it transmitted its programs to its stations and that it therefore must pay license fees for those performances. ASCAP argues that Fox could obtain either a through-to-the-viewer license or a license covering only its performances, leaving the local stations to obtain separate licenses for their own perfor-

mances. ASCAP concedes that the local stations have been licensed for their broadcasts under the interim *Shenandoah* license in place while *Buffalo Broadcasting I* was pending, *see* Letter from Jay Topkis of October 30, 1992, at 3, but contends that that license did not cover Fox's transmission of its programs to the local stations. In ASCAP's view, the terms of the *Shenandoah* license support this argument. ASCAP asserts that the *Shenandoah* license does not cover ABC's, NBC's and CBS's programming because, as all of the parties understood at the time, those networks would continue to obtain licenses for their own performances— i.e., the transmission of their programs to their affiliates—as well as the performances of their affiliated stations. Furthermore, ASCAP maintains that the occasional television network provision in the *Shenandoah* license was intended only to protect the local stations from actions for copyright infringement if the occasional networks failed to obtain through-to-the-viewer licenses for the music used in their programs. Accordingly, the license would cover the local station's broadcast of the program, but not the occasional network's transmission of the program to the local station. In short, ASCAP contends that the terms of the *Shenandoah* license say nothing about whether Fox is required to be licensed for the transmission of its programs to its affiliates.

In arguing for both prospective and retrospective fees, ASCAP maintains that Fox operates like a network and should therefore be licensed on a through-to-the-viewer basis. Otherwise, ASCAP asserts, the substantial revenues generated by Fox have not been and will not be accounted for in the licensing fees paid to ASCAP. ASCAP also insists that no reduction of local station license fees would be necessary if Fox obtained a through-to-the-viewer license because Fox would not be paying twice for the broadcast of its programs. Instead, Fox's fee would be based on its revenues, while the local station fees are based on their revenues—the same arrangement under which ABC, NBC and CBS operate. Finally, ASCAP argues that the *Buffalo Broadcasting I* settlement (for fees through December 31, 1994) and fee-

setting decisions (for 1995 fees) do not preclude licensing Fox separately.

Last, we invited the Committee, which represents the local stations in *Buffalo Broadcasting,* to express its views on whether the license currently in effect for the local television stations encompasses Fox's programming. The Committee argues that the terms of the *Shenandoah* license, as well as the stipulations signed by the parties, the settlement agreement and the opinion in *Buffalo Broadcasting I,* all indicate that the license fees set for the local stations through 1995 cover Fox's programming. In the Committee's opinion, ASCAP should not be able to require Fox to pay retrospective license fees at the distribution level without this Court ordering a commensurate reduction in the license fees paid by the local stations.

### B. Public Performance

The linchpin of ASCAP's argument that Fox must obtain its own license is that Fox's satellite transmissions of its programs to the Fox stations are "public performances" of the music in the programs, for which ASCAP is entitled to collect a fee. ASCAP bases this argument on *David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. 752 (S.D.N.Y. 1988). Showtime and the Movie Channel ("SMC") are corporations that transmit motion pictures to thousands of cable television system operators, which in turn transmit the programs to individual subscribers. During the period from January 1, 1980 through April 3, 1984, SMC was not licensed by ASCAP despite protracted negotiations. ASCAP subsequently sued SMC for copyright infringement for that portion of the unlicensed period that was not barred by the statute of limitations. SMC asserted, as one of its affirmative defenses, that the transmissions of its programming to the cable system operators were not public performances for which ASCAP was entitled to collect a license fee.

In addressing ASCAP's motion to dismiss SMC's affirmative defense, Judge Tenney framed the issue as "whether the transmission of copyrighted material to an intermediary for ultimate transmission to the public falls within the scope of the Copyright Act."

*David,* 697 F.Supp. at 758. Relying on legislative history and Congressional intent that "public performance" be construed broadly, the court found that "Congress intended the definitions of 'public' and 'performance' to encompass each step in the process by which a protected work wends its way to its audience." *Id.* at 759. The court further noted that:

> SMC is a programming originator who intended to broadcast the protected works to the public for a profit. . . . It made little difference to the copyright holders whether SMC intended to route the protected work to the public's living rooms through a local cable company or through a transmitter atop a mountain."

*Id.* Judge Tenney accordingly held that SMC's transmissions to the cable system operators were public performances and dismissed SMC's affirmative defense.

ASCAP argues that the reasoning of *David* requires us to find that Fox's transmissions of its programs to its affiliates and O & Os are public performances of the musical works in those programs for which ASCAP is entitled to collect license fees. We are not persuaded. First, we are not convinced that the satellite transmission of programs from Fox to its local stations is "public." To perform a work publicly is "to transmit or otherwise communicate a performance . . . of the work . . . to the public, by means of any device or process. . . ." 17 U.S.C. § 101 (1988). As Judge Tenney pointed out, the medium of the transmission should not determine whether or not the performance must be licensed. *See David,* 697 F.Supp. at 759. Fox's delivery of its programming to its affiliates is no more public because it is accomplished by satellite transmission than it would be if the tape of the program were delivered to the local stations by mail. The "public" portion of the broadcast would seem to be the local stations' transmission of the program to the individual viewers.

Be that as it may, we need not decide whether Fox's satellite transmissions are public performances of ASCAP music in order to decide whether ASCAP is entitled to license fees from Fox for those transmissions. This is not a copyright case; our job

is to set reasonable rates for Fox's use of ASCAP music and not to decide whether Fox has infringed the copyrights held by AS-CAP's members. Accordingly, as we demonstrate below, even if Fox is publicly performing ASCAP's music by transmitting its programs to its local stations, the reasonable fee that ASCAP could collect for those transmissions is $0 because ASCAP has already been compensated for the use of its music in those broadcasts by the license fees paid by the local television stations.

Therein lies the primary distinction between *David* and the case before us. In *David*, ASCAP had attempted to negotiate license agreements with the cable system operators and had failed. *See id.*, at 754. Because ASCAP's negotiations with SMC had likewise been unsuccessful, those programs were also unlicensed at the distribution level. ASCAP was therefore completely uncompensated for the use made of its music in the movies broadcast by SMC and the cable systems operators. ASCAP was certainly entitled to recover fees at some level of the broadcast process, and Judge Tenney's decision ensured that it would do so. In this case, however, since the local stations have paid ASCAP for the public broadcast of the music included in Fox's programming, AS-CAP may not also recover license fees at the distribution level. We turn now to an explanation of this prohibition.

## C. Prohibition on Collecting Twice

It has long been recognized that ASCAP may not "split" rights in order to collect more than one license fee for any one use of the music in its repertory. This prohibition is apparent in several provisions of the Consent Decree and in the case law applying the Decree.

In 1948, the Court first indicated that collecting fees at more than one level for a particular music use was forbidden. In *Alden–Rochelle, Inc. v. American Society of Composers, Authors and Publishers*, 80 F.Supp. 888, *as amended*, 80 F.Supp. 900 (S.D.N.Y.1948), the Court held that ASCAP's

practices in licensing music use in motion pictures violated the anti-trust laws. Prior to that suit, ASCAP typically licensed a motion picture producer only to record a piece of music on the sound track of the film—the so-called "synchronization right"—while prohibiting its members from granting public performance rights to the motion picture producer. Instead, the motion picture exhibitor was required to obtain a separate license from ASCAP to show the motion picture to the public. Furthermore, the contract that the motion picture producer required the exhibitor to sign in order to obtain the movie mandated that the exhibitor have a license from ASCAP before showing the film. That contract also prohibited any alteration to the film, thereby preventing the exhibitor from deleting ASCAP songs and showing the film without an ASCAP license. *See Alden–Rochelle*, 80 F.Supp. at 892. The *Alden–Rochelle* court found that this arrangement between the motion picture producers and AS-CAP was an unlawful combination that gave ASCAP the power to fix the prices at which it would license the motion picture exhibitors.[5] *See id.*, at 894–95. The court therefore issued an injunction that prohibited AS-CAP from splitting the synchronization and public performance rights for music used in motion pictures.

The 1950 Consent Decree amendments incorporated the terms of the *Alden–Rochelle* decree. The Consent Decree prohibits AS-CAP's members from granting synchronization rights to a motion picture producer without ASCAP or the member also granting corresponding public performance rights. *See* Art. XII(B), Consent Decree. The Decree also now requires that, if ASCAP is granting the public performance license, it issue "[t]o any person engaged in producing motion pictures ... a single license of motion picture performance rights covering the United States ... without requiring further licenses." *See* Art. V(C), Consent Decree. ASCAP may therefore license public performance rights for music in motion pictures only at the production/distribution level and

---

**5.** The Court also noted that many of the motion picture producers controlled music publishing companies that were members of ASCAP. This circumstance further convinced the Court that ASCAP's practice violated the anti-trust laws. *See Alden–Rochelle*, 80 F.Supp. at 892.

not at the level of local exhibitions, the equivalent of the through-to-the-viewer license for broadcasting networks. Nor may ASCAP claim an additional license fee for the delivery of the movie to the local exhibitors.

The Consent Decree also requires ASCAP to issue through-to-the-viewer licenses to telecasting networks. *See* Art. V(A), Consent Decree. ASCAP argues that this through-to-the-viewer license covers both the transmission of the programs to the local stations and their broadcast of the programs to the public. This is true, of course. However, the rationale behind the through-to-the-viewer license is that each broadcast of a program is licensed only once. The Consent Decree requires ASCAP to negotiate with the networks rather than with the local stations in order to set licensing fees for music use in the networks' programs because the networks have more bargaining power than the local stations. This is demonstrated by the lower licensing fees that the networks have paid over the decades that ASCAP has licensed the television industry. *See Buffalo Broadcasting I,* at \*69–71; *Turner Broadcasting,* 782 F.Supp. at 791. As Magistrate Judge Dolinger has pointed out, one purpose of the through-to-the-viewer license requirement for networks was to prevent ASCAP from

> extract[ing] non-competitive fees by the simple expedient of demanding not only a license from the network—which conceivably has some bargaining power by virtue of its ability to control the choice of music to be included in its network programming—but also a separate license from each of the affiliated stations, which lack this leverage since they do not control what music is included in the network programming that they air.

*See Turner Broadcasting,* 782 F.Supp. at 790.

As this Court has previously noted, "the reason for licensing ABC, NBC and CBS is not because of the transmission that takes place from the network central to the local stations, but [because of] the transmission that takes place from the local stations [to the viewing public]...." *See* Transcript of Conference on October 9, 1992, at 15. Forc-

ing ASCAP to negotiate with the networks rather than with the local stations is in no way inconsistent with this reality, and furthers the beneficial objectives of the Consent Decree by providing a check on ASCAP's ability to charge license fees that a truly competitive market would not bear.

This Court has also addressed the issue of splitting rights in the context of cable television. In *Turner Broadcasting,* Magistrate Judge Dolinger was confronted with the question of whether ASCAP should be required to license a number of cable program suppliers on a through-to-the-viewer basis. ASCAP argued that the cable program suppliers should obtain a license that would cover only the transmission of the programming to the cable system operators, who would in turn have to obtain a license to distribute the programming to their individual local subscribers. Magistrate Judge Dolinger rejected this position. He found that the Consent Decree not only embodied the holding of *Alden–Rochelle,* but that it also extended the prohibition on collecting more than one fee per music use to "all industries in which it was potentially applicable." *Turner Broadcasting,* 782 F.Supp. at 794. Magistrate Judge Dolinger therefore held that ASCAP's proposed licensing scheme violated the Consent Decree because it would impermissibly charge fees at the distribution and the broadcast levels. *See id.* at 789–95. Accordingly, he ordered ASCAP to issue licenses to the cable program suppliers on a through-to-the-viewer basis under Art. V(A) of the Consent Decree. *See id.* at 808.

Although ASCAP is seeking to license a television programming supplier and its local television stations, instead of cable program suppliers and local cable system operators, its contentions in this case are analogous to those it raised in *Turner Broadcasting.* The cable systems and Fox may transmit their programming to the viewer in different ways, but their activities are indistinguishable for our purposes. *See id.,* at 803 (neither technical nor financial differences between cable and broadcast television industries warrant disparate treatment under Consent Decree). Once again, ASCAP is seeking to collect

license fees at two levels. The Consent Decree does not permit it to do so.

ASCAP argues that it is not seeking to collect twice. It states that whether Fox obtains a through-to-the-viewer license or a license covering only its transmissions of its programs to its local stations,

> no one will "pay twice." ... Fox's fees would be premised on the substantial advertising revenues paid to Fox, while the fees being paid by its affiliates are premised on their revenues. This is not double payment, just as there is no double payment by ABC, CBS, and NBC and their affiliated stations.

*See* Letter from Jay Topkis of October 30, 1992, at 4. In making this assertion in its argument for retrospective fees, however, ASCAP neglects to mention that the terms of the *Shenandoah* license explicitly exclude revenues from network programming from the revenues on which the local station license fee is calculated because the revenues for programs shown by the three networks are the basis for calculating license fees under the networks' through-to-the-viewer licenses.[6] If Fox's programs were considered "local television programs" for the purposes of calculating the fees owed to ASCAP by the local stations under the *Buffalo Broadcasting* interim fee license, and if Fox's local stations have already paid their share of those fees, then permitting ASCAP to collect a retrospective license fee from Fox for those programs would be permitting it to collect fees at two levels based on the revenue for one public broadcast.

## D. Fees Paid by Fox Stations to ASCAP

Upon reviewing the parties' submissions and portions of the record in *Buffalo Broadcasting I*, we conclude that ASCAP has already collected, or will collect, the total license fees to which it is entitled for the Fox programs aired between 1986 and December 31, 1995—the end of the period for which

*Buffalo Broadcasting I* set license fees for the local stations. We need not pass upon the validity of Fox's argument that the language of the interim *Shenandoah* license conclusively demonstrates that that license covered its programs for the entire period between 1986 and December 31, 1995. We are convinced that the ASCAP records showing that Fox programs were among the programs for which ASCAP collected interim fees during *Buffalo Broadcasting I*, the Stipulated Facts in that proceeding, the terms of the settlement agreement reached between ASCAP and the local stations for license fees through December 31, 1994 and the fee-setting opinions issued in *Buffalo Broadcasting* all show that the Fox stations paid license fees for the use of ASCAP music in Fox programs under the interim *Shenandoah* license in effect during the *Buffalo Broadcasting* proceeding.

At the outset, in the October 9, 1992 conference, ASCAP argued that the local stations' interim fee agreement did not encompass Fox's programs. *See* Transcript of Conference of October 9, 1992, at 9–10, 14, 20–21, 23. In its October 30, 1992 letter, however, ASCAP conceded that "[t]he bottom line, in ASCAP's view, is that, under the arrangements currently in place, Fox's affiliated stations are licensed to perform ASCAP music in Fox's programs...." [7] Letter from Jay Topkis of October 30, 1992, at 3. Although ASCAP no longer contests this point, we find the bulk of Fox's argument persuasive and we will briefly examine Fox's contentions.

Fox first argues that the terms of the *Shenandoah* license explicitly include its programming in the universe of programs for which the local stations pay license fees. The *Shenandoah* license covers, by definition, all programs aired by a local station except programming supplied by a "regular national television network" or by an "occasional television network" that is licensed "at

---

6. ABC, NBC and CBS are indisputably "regular national television networks" whose programs are not considered "local television programs" under the *Shenandoah* license. *See Shenandoah License*, ¶¶ 2A, 2E.

7. In this portion of its letter, ASCAP goes on to assert that Fox's transmissions of its programs were not, but should have been, licensed during this period. As we explained above, however, ASCAP's argument on this point impermissibly seeks fees at both distribution and broadcast levels.

the source," i.e. on a through-to-the-viewer basis. *See Shenandoah* License, ¶ 2A. Fox argues that it is not and has never been either a regular or an occasional network. If that is the case, Fox argues, then its programs must have been licensed under the local stations' interim fee arrangement in place while *Buffalo Broadcasting I* was pending.

A regular national television network is defined as a network that has over one hundred affiliated stations and provides not less than forty hours per week of programming, on average over a six-month period, on a regular basis. *See Shenandoah* License, ¶ 2E. Fox certainly has more than one hundred affiliated stations, but it asserts that it has never averaged more than 40 hours/week of programming in any six-month period. Indeed, from 1986 through September 1993, Fox was indisputably below the 40-hour threshold. Although Fox states that it provided 40 hours/week of programming from September 5, 1993 to January 29, 1994 (a period of less than five months), it represents that from "January 30, 1994–Present," it provided only 35 hours/week of programming. However, Fox made this statement on February 4, 1994—a mere five days later. *See* Letter from Bruce D. Sokler of February 4, 1994, at 2. It is quite possible, although we do not have figures for the period after February 4, 1994, that Fox surpassed the 40 hours/week threshold in 1994. Its 1994 and 1995 programming may well fall within the definition of programming provided by a regular national television network and would therefore be excluded from the coverage of the *Shenandoah* license. Fox is certainly correct that it was not a "regular national television network" from 1986 through 1993, but this prong of its argument is not dispositive of the issue of whether the *Shenandoah* license covered its programs through December 31, 1995.

Fox also contends that it has never been an "occasional television network" and that therefore its programs must fall within the coverage of the *Shenandoah* license. An occasional network is defined as any group of two or more affiliated stations. *See Shenandoah* License, ¶ 2F. Fox certainly meets

this requirement. Fox argues, however, that in order to be "an occasional television network" the music user must hold a license from ASCAP. Fox bases this argument on the provision in the *Shenandoah* license that excludes from the universe of covered local television programs any programs provided by an occasional television network licensed at the source. *See Shenandoah* License, ¶ 2A (definition of "local television program").

At one point in its correspondence, ASCAP seems to counter by arguing that Fox may be an occasional network, because the mere fact that Fox has never held an ASCAP license does not resolve the issue of whether Fox is an occasional network. *See* Letter from Jay Topkis of October 30, 1992, at 3–4. ASCAP contends, rather plausibly, that the source licensing element of the occasional network exclusion was included in the *Shenandoah* license only at the local stations' request in order to protect them from copyright infringement suits if the occasional networks neglected to obtain ASCAP licenses for their programs. Under this view of the provision, the *Shenandoah* license would cover the performance of an occasional network's program, in the sense that the local station would have the right to air the program, but the local station would not necessarily pay the license fee for that music use. ASCAP's argument leads to the conclusion that if Fox's interpretation of the occasional network definition were correct, an occasional network could force the local stations to pay the license fees for its programs merely by refusing to negotiate with ASCAP. We do not believe that the *Shenandoah* license relieves an occasional network of its obligation to negotiate its own through-to-the-viewer license. Hence, this prong of Fox's argument is also not dispositive of the issue of whether the *Shenandoah* license covers its programs through December 31, 1995.

Nonetheless, it is clear that throughout the *Buffalo Broadcasting I* proceeding, ASCAP, the Committee and the local Fox stations treated Fox's programming as if it were covered under the *Shenandoah* license. From our review of portions of the record in that proceeding, we conclude that Fox's programs

are included in the programming for which the local stations have paid or will pay interim fees. Since Fox's local stations have paid fees for their use of ASCAP's music in those programs, ASCAP is not entitled to fees from Fox for those same broadcasts.

The facts to which ASCAP and the local stations stipulated in *Buffalo Broadcasting I* demonstrate that the license fees at issue cover all "non-network" programming[8] broadcast by the local stations during the license periods at issue. The stipulated facts identify, quite clearly, only three networks: ABC, NBC and CBS. *See* Stipulated Facts, *Buffalo Broadcasting I*, at ¶¶ 5, 15, 32, 33. Although Fox began operations in 1986 and the stipulation was not entered into until 1990, Fox is not mentioned. We are therefore led to the ineluctable conclusion that the non-network programming for which the local stations requested Magistrate Judge Dolinger to set the license fees included Fox's programming.

Furthermore, as the Committee pointed out in its October 30, 1992 letter to the Court, local Fox stations actually paid license fees for Fox programs under the interim per-program license. ASCAP does not contest the truth of this representation.

In addition, the *Buffalo Broadcasting I* settlement, which was binding on all of the applicants in that proceeding, determined fees for all of the "non-network" programming through December 31, 1994. *See* Stipulation of September 15, 1993, *Buffalo Broadcasting I*, at ¶ 1. The applicants required to pay fees under the settlement included the Fox O & Os and Fox affiliates, and Fox programs were, as discussed above, among the non-network programs for which the fee disputes were settled.

Finally, with respect to the 1995 fees, Magistrate Judge Dolinger's opinion in *Buffalo Broadcasting I*, and any subsequent modifications of that opinion in response to decisions on appeal, are all based on the Stipulated Facts described above. Whatever fee is ultimately set for 1995, it will include fees for the Fox programming broadcast by Fox's local stations. Through December 31, 1995, therefore, ASCAP will have collected the fees to which it is entitled for the use of its music in Fox programs.

ASCAP's argument that the terms of the settlement agreement and the fee-setting methodologies set forth in the various *Buffalo Broadcasting* opinions do not preclude ASCAP from collecting a separate fee from Fox and from Fox's local stations is beside the point. We need not split hairs over whether the agreement and the opinions permit what ASCAP proposes or could readily be altered to do so. We cannot say whether ASCAP would have chosen in 1990 to stipulate that Fox's programs were included in the programming for which the *Buffalo Broadcasting* proceeding would set fees if ASCAP had possessed a window into the future. The fact remains that ASCAP did stipulate to that effect and that the *Buffalo Broadcasting* proceeding did set the license fees for Fox programming.

The crux of the matter before us is that ASCAP is entitled to collect only one fee for use of its music in Fox's programming. If we were to direct Fox to pay fees to ASCAP for programs aired between 1986 and December 31, 1995, we would be forced to upset the carefully crafted settlement agreement and fee-setting opinions in *Buffalo Broadcasting I* and to alter them substantially in order to reduce the license fees paid by the local stations under those arrangements. We are unwilling to do so. ASCAP has already collected its license fees for the period up to December 31, 1994 from the local stations, and will collect the fees for 1995 from those stations under whatever fee formula is finally set when all of the *Buffalo Broadcasting* appeals are complete. Therefore, even if ASCAP were entitled to collect a

---

8. The Stipulated Facts treat "non-network" and "locally-produced and syndicated" as synonyms. *See* Stipulated Facts, ¶¶ 15, 37(a). This usage suggests that Fox's programs were treated as syndicated programs by both the local stations and ASCAP at the time when the stipulation was signed. While that designation may seem somewhat inaccurate today, when Fox's status in the television market is similar to that of ABC, CBS and NBC, the stipulation is quite specific in excluding only the programs of those three networks from the universe of programming for which the local stations requested Magistrate Judge Dolinger to set reasonable license fees.

license fee for Fox's transmissions of its programs to its local stations between 1986 and December 31, 1995, we hold that the reasonable amount of that license fee, in the circumstances described above, would be $0.

## E. Prospective License Fees

■ Although ASCAP has collected its license fees for the broadcast of Fox's programs from the local stations from Fox's inception in 1986, and will continue to do so through December 31, 1995, ASCAP, Fox and Fox's local stations are, of course, free to restructure the terms of their relationship for license terms beginning in January 1996. Indeed, we believe that ASCAP is correct in its argument that Fox should be licensed on a through-to-the-viewer basis as ABC, NBC and CBS are. In practical terms, Fox does present itself to the public as a fourth network, and its revenues are substantial. Every week, it distributes a substantial amount of programming, clearly identified to the viewing public as Fox programming, to approximately 142 local television stations.

Indeed, Fox may by now have surpassed the 40 hours/week threshold and met the *Shenandoah* license definition of "regular national television network." If that is the case, and if in future negotiations between ASCAP and the local stations the terms of the *Shenandoah* license remain unaltered, Fox's programming would be excluded from the local television programs for which the local stations pay licensing fees. Fox would then presumably obtain a through-to-the-viewer license from ASCAP.

Even if Fox does not maintain that level of programming, however, there is no magic to the 40 hours/week benchmark in defining a "network." The definition of a "regular national television network" in the *Shenandoah*

license is merely a contractual term negotiated by ASCAP and the local stations in the course of arriving at a license agreement. ASCAP and the parties are certainly free, for license terms beginning on January 1, 1996, to negotiate another definition for "regular national television network" that would explicitly exclude Fox and any other similar entities that appear in the future. Again, Fox's programs would presumably then be licensed on a through-to-the-viewer basis.

Furthermore, although we are not called on to decide the issue today, we believe that Fox may well fit the definition of a "telecasting network," for which Article V(A) of the Consent Decree requires through-to-the-viewer licensing. "Telecasting network" is not defined in the Decree. There is precedent, however, for construing the term broadly, to include "any entity that—like [ABC, CBS and NBC]—assemble[s] a unique package of television programming which it supplie[s] to a number of locally-based telecasters with which it maintain[s] a contractual relationship, and which in turn transmit[ ] that programming, under the program supplier's name, to the televisions in its locality." [9] *See Turner Broadcasting*, 782 F.Supp. at 789. Fox would fit that definition. We encourage ASCAP and Fox to give serious consideration to negotiating a prospective through-to-the-viewer license for Fox's programs, as well as ensuring that the terms of the *Shenandoah* license clearly exclude Fox's programming from the set of programs for which local stations pay license fees.

We do not order that the parties do so at this time. Indeed, we cannot. We may only set rates when the parties have sought to negotiate a reasonable fee, failed to arrive at such a fee within 60 days and applied to this Court for relief. *See* Art. IX, Consent De-

---

**9.** If this definition of network is operative, it would explain ASCAP's insistence on licensing Fox and not syndicated program suppliers. Fox prominently markets its programs under its own name, while syndicators do not.

Beyond making this observation, we will not address the merits of Fox's argument that under the anti-discrimination provision of the Consent Decree, ASCAP cannot license Fox's programs at the distribution level when it does not license syndicated programming at the distribution level. Because we hold that ASCAP is not entitled to

retrospective fees at the distribution level, we need not rule on the applicability of the anti-discrimination provision to the circumstances before us. We note, however, that there are important factual distinctions between the way that Fox operates and the way that the syndicators conduct their business that could indicate that Fox and the syndicators are not sufficiently similarly situated to invoke the protection of the anti-discrimination provision. *See* Art. IV(C), Consent Decree.

cree. Fox's application primarily seeks a resolution of the threshold matter of whether it owes any license fee at all to ASCAP; it requests us to set a reasonable fee only in the alternative. The application is not specific about the time period for which it requests this relief. Since this application was filed in August 1992 and the *Buffalo Broadcasting* proceeding set fees through December 31, 1995, we are of the opinion that Fox has not requested us to set fees beyond that time. Furthermore, we wish to give ASCAP and Fox an opportunity to reach a mutually agreeable prospective fee agreement before we embark on the lengthy process of conducting a fee-setting hearing.

We can and do, however, hold today that in future licensing arrangements ASCAP must license Fox's programs on either a through-to-the-viewer basis or at the local level. ASCAP may not extract fees for music use in Fox's programs from both Fox and Fox's local stations. *Cf. Turner Broadcasting,* 782 F.Supp. at 817 (noting that if cable program suppliers are directly licensed by ASCAP and cable system operators only transmit programs provided by licensed cable suppliers, system operators would not need separate licenses).

## CONCLUSION

For the foregoing reasons, we hold that ASCAP is not entitled to collect license fees from Fox for the transmission of Fox's programs to its local stations between 1986 and December 31, 1995, and that, even if it were entitled to do so, the reasonable fee for that activity, in the circumstances described above, is $0. For license periods beginning January 1, 1996, ASCAP may grant licenses for music use in Fox's programs either to Fox, on a through-to-the-viewer basis, or to Fox's affiliates and O & Os, but not at both levels.

**SO ORDERED.**